The **TOWN OF EAST HAVEN** et al.,
Plaintiffs,

v.

**EASTERN AIRLINES, INC.,** et al.,
Defendants.

Civ. A. No. 12175.

**United States District Court,**
D. Connecticut.

July 30, 1971.

See also D.C., 304 F.Supp. 1223.

Cohen & DeMayo, New Haven, Conn., for plaintiffs; Anthony V. DeMayo, New Haven, Conn., of counsel.

Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for defendants Eastern Airlines, Inc. and Allegheny Airlines, Inc.; William R. Murphy, Louis M. Winer, New Haven, Conn., of counsel.

Thomas F. Keyes, Jr., Roger J. Frechette, New Haven, Conn., Robert M. Beckman, Washington, D. C., for defendant City of New Haven.

## OPINION

McLEAN, District Judge.*

Plaintiffs in this action are the Town of East Haven and certain individuals who reside in the vicinity of the Tweed-New Haven Airport. The airport is owned and operated by the City of New Haven. It lies partly within the City of New Haven and partly within the Town of East Haven.

Plaintiffs allege in substance that the operation of the airport and the operation of commercial airliners by defendants Eastern Airlines, Inc. (Eastern) and Allegheny Airlines, Inc. (Allegheny) in and out of the airport have "taken" plaintiffs' property without just compensation, in violation of the Fifth and Fourteenth Amendments, and have constituted a continuing trespass and a public and private nuisance. Plaintiffs seek an injunction against further operation of the airport and damages for the alleged diminution in value of their properties caused by these operations. The individual plaintiffs also seek recovery of so-called "emotional damage" to themselves, *i. e.*, compensa-

* Of the Southern District of New York, sitting by designation.

tion for fear, annoyance, inconvenience and interference with their peace and quiet.

Originally, the City of New Haven was not made a party defendant. Subsequently, in December 1967, plaintiffs, with leave of court, filed an amended complaint joining the City as a defendant.

In January 1968, Chief Judge Timbers granted the motion of the Administrator of the Federal Aviation Agency [1] to dismiss the action as against him. At the same time he denied motions of defendants Eastern and Allegheny and of defendant City of New Haven to dismiss the action for lack of jurisdiction and failure to state a claim. He held that as to the airlines jurisdiction existed pursuant to 28 U.S.C. § 1331 or 28 U.S.C. § 1337, and that as to the City of New Haven jurisdiction existed pursuant to 28 U.S.C. § 1331. He held that the amended complaint stated a claim as to each of these defendants. Town of East Haven et al. v. Eastern Airlines, Inc., et al., 282 F.Supp. 507 (D.Conn. 1968).

In May 1970 I was designated to try the case. Thereafter I conducted pretrial proceedings as a result of which certain changes were effected in the parties and their claims. After a hearing I determined that the action should not be maintained as a class action, there being too many variables in the extent to which residents of the neighborhood were affected by airport and airline activities. The effect of this determination was to strike the allegation of the amended complaint that the individual plaintiffs were acting on behalf of "those similarly situated." Plaintiffs consented that the "New Haven Committee Against Airport Expansion" and the "East Haven Committee Against Airport Expansion," originally named in the amended complaint as representatives of the alleged class of residents of the neighborhood, be eliminated as parties plaintiffs. For reasons of his own, plaintiff Michael Rascati also withdrew.

This left as plaintiffs the Town of East Haven and twelve individuals. On the eve of trial it developed that title to certain of the parcels of real estate was in the joint names of some of the individual plaintiffs and their wives. I permitted the addition of the wives as parties plaintiff solely for the purpose of enabling these plaintiffs to assert claims with respect to the entire fee in their parcels of real property.

Plaintiffs voluntarily withdrew certain of the claims in their amended complaint against defendants Eastern and Allegheny, i. e., claims that operation of aircraft by these defendants was "illegal and/or negligent" in certain respects, and that plaintiffs have been damaged by representations made by these defendants to the Federal Aviation Agency. Plaintiffs also abandoned their claim that the actions of defendants violated the Civil Rights Act, 42 U.S.C. §§ 1983, 1985.

The non-jury trial was completed on October 27, 1970. Certain of the facts, primarily with respect to the history of the airport and the identity of the various airlines which have served it over the years, were stipulated. Upon the basis of all the evidence, I find the facts to be as follows.[2]

---

1. This administrative body is sometimes referred to in this case as the Federal Aviation Agency and sometimes as the Federal Aviation Administration, because of a change in statutory terminology occurring at a relatively recent date. It is the same body, by whatever name, and for simplicity's sake, it will be called the Federal Aviation Agency throughout this opinion.

2. In December 1970, some weeks after the trial had been concluded, the attorneys for defendant airlines advised the court that they feared that airline operations would be drastically curtailed as a result of a decision of the Connecticut state court in an action brought by the Town of East Haven against the City of New Haven, an action which has been prosecuted simultaneously with this federal

## The Airport

The evidence hardly justifies the complaint's characterization of this facility as a "massive regional-type airport." From extremely modest beginnings it has grown into what is still a small airport, by metropolitan standards. It is, however, one of the two airports in Connecticut which provide "trunk line service," the other being the larger Bradley Field serving the Hartford area. The history of the airport's development may be briefly summarized as follows.

The airport started operations in 1931. It was a turf airport, without paved runways or navigational aids, other than a few lights. In 1941 two paved runways were constructed, one now known as Runway 2–20 running approximately north and south, and the other now known as Runway 14–32, crossing 2–20 diagonally and running approximately northwest to southeast. Runway 2–20 was 4,200 feet long, runway 14–32 was 4,100 feet long and each was 150 feet wide. Runway 14–32 has remained unchanged since its construction in 1941. Runway 2–20, however, has been twice enlarged. Since this is the more important of the two runways and is primarily the one used for the aircraft operations of which plaintiffs complain, the fact of the enlargement has significance in this case. In 1951, 571 feet were added to the north end of 2–20 making it 4,771 feet long. In 1967, 829 feet were added to the south end of 2–20 bringing it to its present overall length of 5,600 feet. These additions to the runway were constructed in part with federal funds granted to the City of New Haven for development of the airport pursuant to the National Airport Plan authorized by the Federal Airport Act, 49 U.S.C. § 1101, *et seq.*[3] The extensions of 2–20 were accepted by the Federal Aviation Agency or its predecessor, the Civil Aeronautics Administration.

Over the years certain aids to aircraft navigation have gradually been constructed by the airport. The first was the installation, sometime in the 1950s, of a Visual Omni Range (VOR), a device which emits an electronic signal commonly referred to as a "radio beam." This signal is transmitted on a 360° range (hence the word "Omni") and can be followed into the airport by an airplane pilot from a distance of 25 miles out. The New Haven signal interrupts a similar signal broadcast from the Bridgeport airport at a point over Long Island Sound approximately four miles south of the airport, which is referred to as "Pond Point."

In December 1969 a control tower was constructed. It functions from 6:00 A.M. to midnight. It is operated by employees of the Federal Aviation Agency who control all traffic in and out of the airport. Before this tower was constructed, there was no such central control.

Quite recently, in June 1970, a "VASI" has been installed. This stands for Visual Approach Slope Indicator. It is a device which emits two beams of light, one red and one white, which can be seen by a pilot approaching the airport from the south. The device is set for a glide slope at an angle of 3° above the horizontal. This angle has been approved by the Federal Aviation Agency. If the pilot sees only the red light, he knows that he is below the 3° slope. If he sees only the white light, he knows that he is above it. If he sees a pink light, he knows that he is directly on the 3° slope.

The VASI operates only to the south of the airport. There is none pointed to the north. As the name indicates, the

---

action. I considered it unnecessary and undesirable to reopen the trial to permit further testimony as to any such curtailment. The facts hereinafter set forth are those developed at the trial with respect to the situation existing up to that time.

3. This statute has recently been superseded by the Airport and Airway Development Act of 1970, Public Law 91–258, 84 Stat. 219.

light must be seen to be effective. As yet, there is no instrument landing system at Tweed-New Haven Airport which will guide a pilot to the airport under weather conditions of little or no visibility. Runway 2–20, however, is now equipped with high intensity lights which are of some assistance at night and under bad visibility conditions. Apparently these were installed when runway 2–20 was extended in 1967.

### The Aircraft

The first commercial airline to serve Tweed-New Haven Airport was American Airlines which began operations in October 1934 and continued until 1937, resumed in November 1941 and continued until May 1942, when all operations were suspended by the war. During the war period the airport was used by the Army Air Force as an air base. American Airlines resumed operations in 1946 and continued until April 1960. Throughout these years it operated piston-driven propeller aircraft of various types. No complaint of these operations is made by the present plaintiffs, whose grievances are based on later operations of turbo-prop and jet aircraft, particularly the jets.

Various other airlines, as for example, Northeast Airlines, Mohawk and New York Airlines, have from time to time been certificated to serve New Haven. If they have ever done so, there was no evidence about it. They do not figure in this case.

A small airline, Pilgrim, operates in and out of New Haven. There was at least one reference to it in the testimony, but the decision of this case does not turn in any way on that isolated incident.

Private planes have used the airport from the beginning. At the outset, these were small aircraft. Nowadays not only small planes but larger ones, some of them jets owned by various corporations, make use of the airport. There were several references in the testimony to these private planes, primarily to the fact that some of them

have crashed from time to time in the vicinity. Their activities are relevant to the issues to be decided, but the vicissitudes of these private craft are not determinative of the issues here.

By and large the evidence was concerned primarily with the operations of the only two carriers who were named defendants, Eastern and Allegheny. Of these two, only Eastern has operated pure jets, which are plaintiffs' principal concern. I will first summarize Allegheny's operations:

Allegheny has served the airport since April 1960. It began when American Airlines' service ceased. Until December 1965 it operated piston-driven propeller aircraft. In December 1965 it began to use a type of turbo prop airplane known as the F27–J. In 1967 it added another turbo prop, the Convair 580, and for a year or so thereafter it operated both turbo props and piston-driven propeller aircraft at New Haven. Since sometime in 1968 it has operated only turbo props, which currently are Convair 580s.

Since 1965 the number of Allegheny's flights per day in and out of New Haven have varied from four to ten. At the time of trial it had five flights in and five flights out every day, at various times from the first arrival at 7:15 A.M. to the last departure at 8:40 P.M. The scheduled times were as follows:

| Arrival | Departure |
|---|---|
| 7:15 A.M. | 7:25 A.M. |
| 11:00 A.M. | 11:25 A.M. |
| 2:45 P.M. | 2:55 P.M. |
| 3:45 P.M. | 3:55 P.M. |
| 8:30 P.M. | 8:40 P.M. |

Eastern began service at Tweed-New Haven on February 1, 1950. Thus, for ten years from 1950 to 1960, the two principal airlines serving the airport were Eastern and American, whereas since 1960 they have been Eastern and Allegheny.

From 1950 until April 30, 1967, Eastern operated various types of piston-

driven propeller aircraft. On the latter date it replaced these aircraft with turbo prop Electras which it operated only until October 29, 1967, when it began to operate pure jets, DC–9s and Boeing 727s. After only some two months, Eastern stopped flying the jets on January 4, 1968. It continued thereafter either with piston-driven Constellations or turbo prop Electras until January 9, 1969, when it discontinued all operations. Approximately one and one-half years later, on June 17, 1970, Eastern resumed service at New Haven with pure jets, DC–9s and Boeing 727s, which it was continuing to operate at the time of the trial.

The number of Eastern flights per day in and out of New Haven has varied from four to six. At the time of the trial, there were four flights per day, two in and two out, on the following schedule:

| Depart | Arrive |
| --- | --- |
| 7:15 A.M. | 2:17 P.M. |
| 3:00 P.M. | 9:25 P.M. |

Both Eastern and Allegheny's aircraft fly to and from New Haven to cities in other states, New York, Washington, D. C., etc. Their flights thus constitute interstate commerce. Both carriers hold certificates of public convenience and necessity issued by the Civil Aeronautics Board which require them to provide air carrier service at New Haven unless and until the Board permits them to discontinue it.

It will be seen from the foregoing recital that the turbo prop flights of which plaintiffs complain began in December 1965, as far as Allegheny is concerned, and on April 30, 1967, as far as Eastern is concerned. Allegheny has continued to use only turbo props. Eastern began to operate its pure jets in October 1967, but did so only for some two months until January 4, 1968.

Thereafter there were no jets until Eastern started flying them again on June 17, 1970.

### The Individual Plaintiffs

Each of the twelve plaintiffs lives in the vicinity of the airport, but they do not all live in the same neighborhood. Because of the difference in their proximity to the airport and the flight path of the planes, they are affected in different ways and to different degrees by the airport operations. Roughly speaking, plaintiffs' residences can be classified into four geographical areas. Four plaintiffs live near the terminal building at the northwest end of the airport, six live in the Morgan Avenue area, slightly to the southwest of the airport, one lives to the southeast, and one almost directly south. The facts established by the evidence relating to each group may be summarized as follows.[4]

### The Northwest Area

The four plaintiffs in this group, with their respective addresses, are: N. Leo Corona, 133 Girard Avenue, Andrew A. Proto, 120 Stuyvesant Avenue, Salvatore Criscuolo, 111 Stuyvesant Avenue, and Michael Fusco, 25 Holmes Street. Of these four, Fusco is in a slightly different position from the others, for his house is almost directly north of runway 2–20, whereas the other three live to the northwest.

Corona's house, which he purchased in 1956, is directly across the street from the terminal building, no more than 100 feet away. Runway 14–32, the shorter of the two runways, extends back from the terminal building in a southeast direction. Small planes taking off from and landing on this runway pass "alongside" Corona's property, but not directly over it. Planes taxiing up to the terminal and standing there with their engines running emit fumes, soot

---

4. Without exception, these plaintiffs impressed me as truthful witnesses. As one would expect, they varied considerably in their ability to express themselves. Many of them were vague as to dates and details.

and noise which are carried by the wind over Corona's house. Eastern and Allegheny planes do not take off from this runway but they do taxi to the terminal and add their fumes and noise to that created by the other planes.

Proto's house, which he purchased in 1959, is a few blocks from Corona's northwest of the terminal building. It is approximately 300–400 feet from the airport boundary. His complaints are substantially similar to Corona's. Eastern and Allegheny planes taxiing to the terminal and idling on the runway make noise and give off soot, smoke and smells. This interferes with Proto's enjoyment of his property, particularly the outdoor area.

Proto also testified that he lives in fear of injury from plane crashes, for at least three small private planes have crashed in the neighborhood over a period of some years. As far as appears, no Eastern or Allegheny plane has ever crashed at or near the airport.[5]

Salvatore Criscuolo is a neighbor of Proto's, only a few doors away. He built his house in 1954. It is approximately 350–400 feet from the airport. His situation is essentially the same. He is annoyed by the noise, fumes and odors emanating from Eastern and Allegheny planes near the terminal building and taxiing to and from the runways. He testified that these disagreeable conditions began in "approximately 1966." They usually occur at four times during the day, approximately 7:00 A.M., 3:00 P.M., 6:00 P.M. and 9:00 P.M. Criscuolo also expressed fear of possible crashes.

Fusco, as previously mentioned, lives due north of runway 2–20, some few blocks to the east of Corona, Proto and Criscuolo. His property, which he acquired in 1962, is about 900 feet from the airport boundary. Planes landing from the north on runway 2–20 or taking off to the north from that runway pass very close to his house at a height which he estimates at 55 feet. Fusco's testimony was not entirely clear as to whether the planes passed directly over his house or a few feet to one side. They make so much noise that it is impossible to talk in the house at the time. This condition has grown worse "since the jets came in."

Fusco is also distressed by the noise, soot and smells from planes idling on the runway before taking off to the south. The jets are what give him the most trouble, as far as smoke and soot are concerned. He was not specific as to the number of flights per day that pass close to his house. He testified that planes came near his house every day. It would seem that these would not often be Eastern or Allegheny flights, for the evidence shows that, in general, Eastern and Allegheny planes land from the south and take off to the south. It is true that on occasion, because of wind conditions, planes approaching the airport from the south circle the field and land from the north.

Inasmuch as the annoyance from the noise and fumes emitted by planes idling on the runway is experienced by these four plaintiffs more than by the others, since these four live closer to the terminal, this is an appropriate point to mention that there was testimony on this subject from sources other than these four. It frequently happens that an Eastern or Allegheny plane will taxi to the end of the runway and stay there, with its engines running, for some time before taking off. Usually this interval is only a few minutes, but on occasion it has been observed to continue for half an hour or more. This comes about because the control tower will not permit the plane to depart because of traffic conditions, often conditions miles away from the airport itself. Regulations require the pilot to keep the engines running ready for immediate takeoff.

5. Several months after the trial the newspapers reported that an Allegheny plane had crashed in the vicinity of the airport.

Obviously, there was no evidence about this incident at the trial and neither side has asked the court to take note of it.

The pilot has no discretion in the matter for he is bound to obey the instructions of the tower. From the airport's point of view this situation, annoying as it is to residents of the neighborhood, is unavoidable.

Mention may also be made of another noise which on occasion has occurred near the terminal building in the evening. This is a humming noise made by the apparatus used to clean an Eastern jet which arrives at New Haven at about 9:00 P.M. and spends the night there. As far as appears, this is a relatively infrequent occurrence. It adds little to plaintiffs' case.

### The Southwest Area

There are six plaintiffs in this group, Jeremiah Camarota lives at 44 Morgan Terrace. He owns another house nearby at 50 Morgan Terrace, as well as a part interest in a vacant lot, No. 33 or 35 Morgan Terrace. Leslie Munro also owns two houses. He lives in the one at 114 Morgan Avenue. The one at 110 Morgan Avenue is occupied by his brother-in-law, plaintiff Earle W. Jones. Until January 1969, Jones owned and operated an automobile service station at 52 South End Road. Michael Criscuolo lives at 72 Morgan Avenue. Alphonse Guidone, Jr., lives at 6 Canna Drive, which is near Jones' former service station on South End Road. M. James Canali's property is at 19 Lighthouse Point Terrace, which is also near South End Road.

Morgan Avenue runs along Long Island Sound. Morgan Terrace is adjacent to Morgan Avenue. Munro's, Camarota's and Michael Criscuolo's properties are shorefront properties. South End Road, Canna Drive and Lighthouse Point Terrace are a few blocks inland. The entire area lies to the south and slightly to the west of the south end of runway 2-20. It is close to the flight path of Eastern and Allegheny planes landing on that runway from the south and taking off from it to the south. The distance in a direct line from the south end of the runway to the shoreline is approximately 4,170 feet.

Camarota purchased 44 Morgan Terrace in 1959 and 50 Morgan Terrace in June 1967, which is approximately when he acquired his interest in the vacant lot. His properties are the most westerly of this group. They are not within the regular flight path of the jet planes, although the noise and soot from the planes disturbs Camarota and if a plane turns west after takeoff, it passes over his house.

Camarota's testimony related primarily to various incidents which he had noted in his diary for October and November 1967. This was within the period of Eastern's first jet operation which, as we have seen, lasted from October 29, 1967 to January 4, 1968. Camarota noted a few occasions on which planes passed unusually near his house, flying low. One such incident involved an Eastern plane on November 2, 1967 and another an Allegheny plane on November 4, 1967. On December 21, 1967, a Pilgrim plane passed over the house only fifty feet up. Almost two years later, on October 13, 1969, Camarota observed a plane, in very bad weather, circling the area eleven times, apparently trying to land. It went over his house in the process. It does not appear who the operator of the plane was.

Munro's property lies somewhat to the east of Camarota's and hence nearer to the regular flight path of the Eastern and Allegheny planes. Munro has resided at 114 Morgan Avenue since approximately 1952, when he built the house. Previously, he had lived at 110 Morgan Avenue, which is next door, since 1931. He testified that planes coming in from the south pass approximately 200 feet east of his house and planes taking off go "practically over" it. Other evidence indicates that the departing planes go over 110 Morgan Terrace, not 114. In any event, vibrations from the planes have broken windows in Munro's house at 114. Soot from the planes has dirtied the house

substantially. The noise is so "terrific" that it is impossible to talk when a plane goes by.

Munro was vague as to the height of the planes. Sometimes they are lower than 200 feet, sometimes higher. The planes are higher going out than coming in, probably around 400 to 500 feet up after takeoff.

Since Earle W. Jones does not own the house which he occupies at 110 Morgan Avenue he is not in a position to make any claims for its taking. This claim is asserted by Munro. Jones seeks recovery, however, for "emotional" damage and he also contends that the value of his former business property on South End Road was reduced because of the disturbance caused by passing planes.

As far as 110 Morgan Avenue is concerned, the situation is substantially the same as that previously described with respect to No. 114, although it is slightly worse because outgoing planes pass more directly over No. 110.

Jones' former business property, which he owned and operated for forty years until January 1969 lies more directly in line with runway 2–20.[6] Jones testified that planes fly over his service station, that they come in very low, from 100 to 140 feet above the building, and that the noise and black smoke are very bad. The jets "are the worst." Small planes are not as noisy or dirty, but they are also disturbing because they "come in from any direction * * * you never know which way they are coming from."

Michael Criscuolo built his house at 72 Morgan Avenue in 1965. He had no problems then. He blames his present trouble on Eastern and Allegheny, but he is uncertain as to when it began. Incoming planes pass almost over his house, a little to the right of it, with the usual accompaniment of noise, soot and vibration. Lights on the planes at night also disturb him. Criscuolo testified that Eastern seems to fly a set pattern but Allegheny and the other planes do not, "they are all over the place." Criscuolo testified that there are at least seven flights a day which cause him this annoyance.

Alphonse Guidone, Jr. has resided at 6 Canna Drive since 1953. The planes began to disturb him in March 1967. He complains of the noise, soot, fumes and vibration. He testified that some planes pass directly over his house, whereas others pass slightly to one side, and that their altitude at times is as low as from 45 to 100 feet. Guidone was more specific in his testimony than some of the other witnesses. On November 2, 1967, the vibration from an Eastern jet shook a picture off his wall. The vibration loosens his fuse box and electrical connections so that his kitchen window fan ceases to operate when a jet takes off. He testified from contemporaneous notes as to low approaches by Eastern planes on four different days in November 1967. On foggy days planes have been known to circle his house several times, apparently attempting to land.

M. James Canali acquired his house at 19 Lighthouse Point Terrace in May 1962. It is four or five blocks from runway 2–20. Private planes occasionally fly over the house at a low altitude. The commercial airliners do so only in bad, foggy weather. This has occurred on "several occasions" in the past four or five years. More frequently, even on clear days, approaching commercial planes which are not "right on target" for the runway pass close to Canali's house, to the alarm of his family. The noise and pollution disturb him. He dates the beginning of his troubles in 1965 or 1966. It is the jets which cause most of the annoyance. They fly by three times a day.

6. This property on South End Road is almost directly south of the runway. Strictly speaking, it would be more accurate to include it in the southern area discussed hereinafter. I have mentioned it here, however, for convenience, inasmuch as its former owner, Jones, resides in the southwestern area along with the other plaintiffs now under consideration.

### The Southeast Area

Leon Amendola is the only plaintiff in this area. The house at 2 Meadow Place is in line with the southeasterly end of runway 14–32, but at a considerable distance from it, just how far does not appear. He acquired his house in 1958.

At some time within the past five years, a private plane owned by a corporation fell in Amendola's front yard. Understandably, this incident has aroused fear in his family that it might happen again, with more disastrous results. Planes frequently fly over his house, so close that he can see the "rivets" on them. They produce the usual noise and pollution. Amendola was uncertain as to who operates these planes. He could not identify them as Eastern or Allegheny aircraft, and it seems unlikely that they are, for these airlines do not normally use runway 14–32.

### The Southern Area

Louis Audette and his wife Anna live at 10 Silver Sands Road, which is only slightly to the east of a direct line running south from the south end of runway 2–20. It is approximately 3,000 feet from the end of the runway.

They bought the house in September 1966. Before doing so, Mrs. Audette made inquiry of some unidentified person at the ticket counter in the airport about future air carrier operations. She was told that four-engine turbo props might be put in service, but that there would be no pure jets. To her dismay, the jets started in October 1967.

The Audettes' testimony was the most complete of any of the plaintiffs. It was supported with a moving picture of incoming planes taken by Audette in December 1967 and January 1968, and with rather elaborate sound measurements made by Audette, under the supervision of a professional sound expert, in October 1970. A recording of these jet noises was played in the courtroom. In addi-

tion to this, Mrs. Audette kept a record of aircraft movements for a time in the fall of 1967 and again in the fall of 1970.

There is no doubt that the Eastern jets, on arrival and departure from the airport, pass close to the Audettes' house at a low altitude. Just how close and how low was the subject of considerable testimony which to some extent is conflicting. On all the evidence I find that normally the jets pass approximately 125 feet west of the house, but this is a theoretically perfect course which is not always followed. At times the planes fly directly over the house. As far as altitude is concerned, the "computed" figures put in evidence by defendants indicates a height at the Audettes' property of 220 feet for incoming planes and 620 feet for outgoing planes. Again, this is a theoretical standard which is not invariably adhered to. Altitudes of 50 feet for incoming planes and slightly higher for outgoing planes are not unusual. According to Mrs. Audette, six Allegheny turbo prop flights and four Eastern jet flights go by or over the Audettes' property every day.

The noise generated by the jets is extremely loud, to put it simply. Without going into all the technicalities of the expert's testimony, or the results of all the tests, it is sufficient to say that actual measurement at the Audettes' property on October 20, 1970, with respect to the noise made by an Eastern 727 taking off to the south and an Eastern DC–9 landing from the south, show that the noise created by the former measured 102 db(A) outdoors and 80 db(A) indoors. The noise created by the latter measured 96 db(A) outdoors and 75 db(A) indoors.[7] This compares with 90 db(A) for the noise at a point within 50 feet of a modern automobile thruway and 78 db(A) for the noise made by a ringing telephone. The sound of the airplane gradually increases as the plane approaches, rises to a crescendo, and gradually diminishes as the plane de-

7. db(A) stands for the decibels measured on the A "weighted network." It is a measurement of "sound pressure level."

parts. The maximum intensity of the sound lasts only 1½ to 2 seconds.

The vibration emanating from the jets is also intense. At about 7:00 A.M. on November 4, 1967, an Eastern jet on its way to the airport passed the Audettes' house and the bedroom window broke. At 2:31 P.M. on December 23, 1967, an Eastern jet came over the Audettes' house and the skylight of their studio broke. Mrs. Audette summed up her feelings in the matter by saying that although the only difference that had occurred since they bought their property is the fact that jet aircraft have been substituted for other types of aircraft, "this is an enormous difference."

### The Alleged Diminution in Value of Plaintiffs' Properties

Each side called a real estate expert who testified on this subject. They agreed that, due to the general rise in real estate values throughout the New Haven area, plaintiffs' properties have actually become more valuable since they acquired them. As might be expected, however, the experts disagreed as to whether the value of these properties would have increased still more were it not for their proximity to the airport. It will be more convenient to discuss the details of this testimony at a later point in this opinion.

### Previous Complaints by Plaintiffs

It was stipulated that before beginning this action in 1967, none of the plaintiffs instituted legal action to challenge the airport expansion or to claim that there had been any taking of their property. It was further stipulated that except to the extent that the filing of the complaint in this action might be considered to be a protest, none of the plaintiffs has protested or complained to the Federal Aviation Agency concerning any alleged violations of law or regulations by Eastern or Allegheny or their employees. This stipulation was later qualified to a minor extent by a reference to a complaint made by Audette,

the nature of which was never fully explained.

### The Town of East Haven

Although the complaint alleges that streets, schools, parks and beaches owned by the Town are within the zone of influence of the airport and are affected by its operation, there was no evidence of any adverse effect on the Town's property. There is thus no possible basis for a finding that any property of the Town has been "taken," in the sense that the individual plaintiffs use that term. The Town's theory of recovery is quite different. It is founded upon the grant agreement between the City of New Haven and the Federal Aviation Agency pursuant to which federal funds were made available to the City to finance the extension of runway 2–20. The airlines were not parties to that agreement. The claim of the Town is not aimed at them, but is directed solely at the City of New Haven.

The grant agreement was executed on April 4, 1967. The City applied to the Federal Aviation Agency for the grant in a formal "project application" dated October 13, 1966. This document was on a printed form apparently supplied by the Federal Aviation Agency, part of which consisted of some two pages of "sponsor's assurances" in which the City agreed to a number of things required by the Federal Airport Act (49 U.S.C. § 1101 *et seq.*) and regulations pursuant thereto. These assurances are obviously "boiler plate" material exacted of all applicants.

Effective January 27, 1967, Section 151.26 of the regulations (14 C.F.R. § 151.26) was amended to include a provision that:

> "(b) Each sponsor must submit with his application a written statement specifying what consideration has been given to the interest of all communities in or near which the project is located. This statement must contain the substance of any objection to, or approval of, the proposed

project made known to the sponsor by any local individual, group or community."

No such statement was included in the sponsor's assurances nor in any other part of the City's project application nor, as far as appears, was any such statement submitted separately along with the application. It is plain that no such statement was required by the regulation at the time that the application was filed, but it was required by the amended regulation at the time that the grant agreement was signed some six months later.

In order to carry out this expansion in 1967, it was necessary for the City to purchase land in East Haven, which it proceeded to do. At the time, the Town of East Haven opposed further expansion of the airport, although some years earlier, in 1962, the First Selectman of East Haven had been in favor of it. The City was aware of this opposition. The Town now contends that in its application for federal funds in 1966 the City should have revealed the fact that the Town objected and that its failure to do so amounted to a false and fraudulent misrepresentation which has caused damage to the Town.

In June 1967 the Town sued the City in the Superior Court of Connecticut. Its complaint alleged, among other things, that the City had not obtained the consent of the Town for the acquisition of the land in East Haven necessary for the airport expansion and that its failure to do so violated Section 15–79 of the Connecticut General Statutes. In May 1968, the Superior Court upheld this contention, and on appeal its decision was affirmed by the Supreme Court of Connecticut in 1970. Town of East Haven v. City of New Haven, 159 Conn. 453, 271 A.2d 110 (1970). This is the litigation referred to earlier in this opinion which has proceeded simultaneously with the present case.

In March 1969, the City submitted another project application to the Federal Aviation Agency seeking federal funds to finance further improvements at the airport in the way of better drainage, marking runways, etc. This application resulted in a new grant agreement signed on April 21, 1969. The application does not refer to the state court litigation between the Town and the City. The Town claims that it should have done so. Furthermore, the application does not contain the statement required by Section 151.26 of the regulations as to the objections of neighboring communities. With respect to this application, the Town now makes a claim of fraud and misrepresentation similar to its claim with respect to the earlier 1966 application. It should be noted that this second application was submitted several years after the present action was begun.

Mention may be made at this point of the fact that each side called a witness to express his opinion as to whether the operation of jets at the airport serves the best interests of the two warring municipalities. The planning consultant of East Haven, called by plaintiffs, voiced the view that the noise and pollution caused by the jets "have a negative effect on the stability of the area." Defendants countered by calling the chairman of the Industrial Development Committee of the Greater New Haven Chamber of Commerce who spoke in glowing terms of the advantages of fast transportation as a stimulant to industrial development. These opinions, both of which may be assumed to be correct, merely serve to emphasize the fundamental difficulty of attempting to reconcile the point of view of people who make their homes in this area with that of advocates of industrial growth, in which, incidentally, East Haven is also interested.

### Defendants' Case

Each defendant offered evidence of certain facts, some of which were stipulated. Others were not disputed by plaintiffs, although there was controversy as to some of them. They may be summarized as follows.

The airport serves a Greater New Haven area containing some 750,000 people. Since 1947 it has been included within the National Plan for Development of Public Airports prepared by the Administrator of the Federal Aviation Agency and his predecessors. The United States Government has invested in excess of $3,000,000 in developing the airport, the City of New Haven has expended in excess of $3,500,000, and the State of Connecticut in excess of $1,450,000. Prior to the expenditure of federal funds for the 1967 extension of runway 2–20, the Federal Aviation Administrator certified that these facilities were reasonably necessary for use in air commerce or in the interests of national defense. Among the "assurances" given by the City of New Haven to the Federal Aviation Agency in its application for this grant was a promise on the City's part to operate the airport for the use and benefit of the public and to make no changes in the airport or its facilities other than in conformity with the airport layout plan as approved by the Federal Aviation Agency, if such changes might adversely affect the safety, utility or efficiency of the airport. As previously noted, the operation of aircraft at the airport is now directed by Federal Aviation Agency personnel in the control tower.

The airlines, even more than the airport owner, emphasize the continued presence of federal control. Each individual aircraft must be certified by the Federal Aviation Agency to be airworthy. Each pilot must be licensed by that agency. Each carrier holds a certificate issued by that agency attesting that it is properly and adequately equipped and able to conduct a safe operation as an air carrier.

Before it began to operate 727s and DC–9s at New Haven in 1967, Eastern obtained from the Federal Aviation Agency an amendment to its "operations specifications" authorizing regular operation of such aircraft. Incident to that authorization, the Federal Aviation Agency caused an "Air Carrier Station Facility Inspection" to be made.

Before they initiated air transportation service at New Haven, the airlines were required to obtain a certificate of convenience and necessity from the Civil Aeronautics Board. Before they could discontinue their present service, they would need to obtain the approval of that board. Eastern's and Allegheny's certificates authorize them to transport mail. This brings the Postmaster General into the picture. He has designated schedules for the transportation of mail to and from New Haven.

The actions of pilots in actual flight are prescribed by a flight manual which is approved by the Federal Aviation Agency. Considerable testimony, sometimes in rather confusing detail, was devoted to this subject. There are two sets of rules, "instrument flight rules" for the jets which Eastern operates, and "visual flight rules" for the turbo props which Allegheny operates.

In substance, under either set of rules, the pilot of a plane approaching the airport from the south, as the Eastern and Allegheny planes normally do, is supposed to put his craft in a "landing configuration," i. e., to put the flaps down, the landing gear out, etc., at Pond Point, about four miles from the airport, and thereafter to maintain a specified speed and rate of descent and to follow the specified 3° glide slope set by the VASI until his plane touches down near the south end of runway 2–20. If the wind is behind him (unless the wind is less than 10 knots in force), he is supposed to fly past the runway to the north end, turn and land from the north into the wind. Since New Haven has no instrument landing system, the rules forbid the pilot to attempt to land unless he can actually see the runway from an altitude of 380 feet.

Ever since the control tower began to function in December 1969, the approaching pilot is subject to the instructions of the tower personnel at all times as he comes in. Before the tower was built,

the prescribed procedure called for the aircraft first to fly downwind parallel to the runway at an altitude of 1,200 feet, and then to make a 180° turn before landing into the wind. The purpose of this procedure was to enable the pilot to observe whether any other planes were in the way. Not infrequently, private planes were. In December 1967, the Airline Pilots Association complained to the City of New Haven about these conditions and demanded the installation of equipment to promote safety, including a control tower and a VASI system, which were subsequently installed in December 1969 and June 1970, respectively.

It is apparent that with the aid of the control tower and the VASI, approaches from the south are more standardized than they formerly were. Nowadays, in theory at least, each landing should be like all others.

There are also prescribed procedures for takeoff. The "noise abatement profile" calls for getting a jet plane up in the air as soon as possible. Jets climb more steeply than non-jets.

### Legal Issues and Conclusions

The picture which emerges from the detailed facts heretofore recited at length may be described as follows. We have here a small public airport, owned and operated by a municipality, gradually expanded since its inception with the aid of federal funds and in accordance with federal statutes and regulations. Since 1950 it has been served primarily by two airlines, Eastern and American from 1950 to 1960, and Eastern and Allegheny from 1960 to the present. The airlines have been duly licensed and certificated by the appropriate federal administrative agencies. These airlines operate a limited service, comprising at the time of the trial four flights per day, two in and two out, by Eastern, and ten flights per day, five in and five out, by Allegheny.

All twelve plaintiffs, with one possible exception,[8] acquired their present properties after the airport was opened in 1931 and also after 1951, by which time the airport had been improved by paved runways which have remained as they then were ever since, except for the addition of 829 feet to runway 2–20 in 1967. All twelve plaintiffs, however, acquired their properties before the pure jets, as distinct from the turbo props, began operating in October 1967 on the extended runway 2–20.

The jets, and to a lesser extent the turbo props, have caused distress and annoyance to each of the twelve plaintiffs, and in some instances some physical damage to their real property. The degree of this annoyance and damage is not the same as to each plaintiff, nor is the cause the same in every instance. Some plaintiffs are annoyed by the noise and fumes from planes idling on the runway, whereas others are afflicted by noise, soot and vibration from planes which pass close to their house.

Eastern and Allegheny are required by federal regulations to land and take off in a prescribed manner and, by and large, they do. Prior to the installation of the control tower, there was probably somewhat more deviation from the prescribed procedure than there has been since, but the evidence of any such deviation is very scanty. Plaintiffs have not shown that Eastern or Allegheny have operated their planes in a negligent manner.

The Town of East Haven, which at one time favored airport expansion, now opposes it, officially, at least. It has successfully carried on a lawsuit against the City of New Haven in the Connecticut state courts. It claims here that it has been damaged by the City's failure to reveal the Town's opposition in the City's application for federal funds.

On these essential facts the court is called upon to determine whether plaintiffs are entitled to any relief, and if so,

8. The house owned by Munro and occupied by Jones at 110 Morgan Avenue was acquired in 1931. Jones acquired his gas station in 1929 and sold it in 1969.

to what extent. I will consider first the claims of the individual plaintiffs.

### Injunctive Relief

■ Plaintiffs ask the court to close down the airport, or at least to forbid its use by jet planes. One plaintiff testified in substance, I believe sincerely, that it would be much more valuable to him to stop the jet aircraft than to obtain an award of money damages. Understandable as this point of view may be, it is clear that this court cannot adopt it. No case has been found in which an injunction has been granted against the operation of a public airport or of a particular type of airplane at that airport, when both the airport and airplanes have been operated in accordance with federal statutes and regulations.

A few early cases cited by plaintiffs, of which the one most frequently mentioned is Swetland v. Curtiss Airports Corporation, 55 F.2d 201 (6th Cir. 1932), are not in point. They involved small private airports in no way comparable to Tweed-New Haven. As Judge Dooling pointed out in American Airlines, Inc. v. Town of Hempstead, 272 F.Supp. 226, 231 (E.D.N.Y.1967), aff'd, 398 F.2d 369 (2d Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969), such a case as Swetland "is not expressive of the present-day law applicable to public airports."

Defendants question the court's power to grant such an injunction. The question need not be decided, for assuming that the court has the power, it would be manifestly inequitable to exercise it. The right of the public to travel by air by means of modern airplanes far outweighs the disadvantage to the relatively few persons, such as these plaintiffs, who are adversely affected to some extent. I see no need to expand upon this proposition, which to my mind is self-evident. Injunctive relief must be denied.

### The Alleged "Taking" of Plaintiffs' Properties

Plaintiffs maintain that defendants have "taken" their properties without just compensation in violation of the Fifth and Fourteenth Amendments in that the operation of the airport and of the jet planes which fly in and out of it has substantially impaired the value of plaintiffs' properties for residential use. They ask that they be awarded compensation for that reduction in value, and that defendants, by the process referred to as "inverse condemnation," upon payment of such compensation, be given an easement in plaintiffs' properties to permit defendants to continue to "use" them in the manner in which they are using them now. This contention raises the most difficult question in this case.

The "taking" doctrine, as far as airports and aircraft are concerned, derives from the Supreme Court's decisions in United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and Griggs v. Allegheny County, Pa., 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). These decisions have since been interpreted and applied in a number of cases most of which have been suits under the Tucker Act, 28 U.S.C. § 1346(a) (2), against the United States arising out of operations at military air bases.

Causby held that an easement in plaintiff's land was taken by the United States, in the constitutional sense, when heavy bombers from a neighboring base, upon takeoff and landing, "frequently" passed over plaintiff's land "in considerable numbers," as low as 83 feet, thereby subjecting plaintiff to noise and glare and causing plaintiff's chickens to panic and kill themselves by flying into walls.

The Court made several statements which, because of their importance for later cases and the present one, are quoted in full. It said (328 U.S. at 262, 66 S.Ct. at 1066):

"In the supposed case, the line of flight is over the land. And the land is appropriated as directly and com-

pletely as if it were used for the runways themselves.

"There is no material difference between the supposed case and the present one, except that here enjoyment and use of the land are not completely destroyed. But that does not seem to us to be controlling. The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value."

The Court further said (328 U.S. at 266, 66 S.Ct. at 1068):

"The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."

The Court pointed out that although Congress has granted every citizen "a public right of freedom of transit through the navigable airspace of the United States" (49 U.S.C. § 403, now § 1304), the "navigable airspace of the United States," as then defined by statute and regulation, began at a height of not less than 500 feet above the ground for air carriers, and extended upward from that level. Hence the offending planes, when they passed over plaintiff's property as low as 83 feet, were not in the "navigable airspace of the United States" which Congress had placed within the public domain.

After the decision in *Causby*, Congress amended the statute so as to define "navigable airspace" to include "airspace needed to insure safety in take-off and landing of aircraft." 49 U.S.C. § 1301 (24). Any doubt which might have arisen as to whether the *Causby* rule was affected by this amendment was dispelled by *Griggs*, which was decided after the amendment. In *Griggs*, the Supreme Court held that Allegheny County, which owned and operated the Greater Pittsburgh Airport, had taken an easement over plaintiff's property for which the Fourteenth Amendment required it to pay compensation. The airport, like Tweed-New Haven, was part of the National Airport Plan. It was designed in conformity with rules and regulations of the Civil Aeronautics Administration. The "master plan" approved by the Administrator contained an approach area which passed over plaintiff's home. There was a clearance of some 11 feet between the bottom of the plane's glide angle and the top of plaintiff's chimney. "Regular and almost continuous daily flights" made by "a number of airlines" passed "directly over and very, very close to plaintiff's residence." The Court held that this was a taking despite the fact that the landing planes were within the navigable airspace of the United States as defined by the amended statute. The Court said (369 U.S. at 88-89, 82 S.Ct. at 533):

"But as we said in the *Causby* case, the use of land presupposes the use of some of the airspace above it. 328 U.S. at 264 [66 S.Ct. 1062]. Otherwise no home could be built, no tree planted, no fence constructed, no chimney erected. An invasion of the 'superadjacent airspace' will often 'affect the use of the surface of the land itself.' 328 U.S. at 265 [66 S.Ct. at 1068]."

The great majority, although not all, of the cases which have passed on this question since *Causby* and *Griggs* have taken those decisions to mean that there cannot be a taking unless there is an invasion of the airspace over plaintiff's property by planes flying over it. Thus, annoyance and damage, which may be very real, caused by noise, fumes and vibrations due to activities on an adjacent

airfield, do not constitute a taking. This damage, shared by plaintiff in common with all other residents in the vicinity, is merely "consequential" damage, within the rule of Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914), a railroad case which long antedated *Causby* and which the *Causby* court distinguished. Many cases so hold. Batten v. United States, 306 F.2d 580 (10th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed. 2d 502 (1963); Nunnally v. United States, 239 F.2d 521 (4th Cir. 1956); Avery v. United States, 330 F.2d 640, 165 Ct.Cl. 357 (1964); Leavell v. United States, 234 F.Supp. 734 (E.D.S.C.1964); Pope v. United States, 173 F.Supp. 36 (N.D.Tex.1959).

Some courts, applying this principle, have held that there is no taking when planes fly by plaintiff's property, in close proximity to it, but not over it. Freeman v. United States, 167 F.Supp. 541 (W.D.Okla.1958). See Moore v. United States, 185 F.Supp. 399 (N.D.Tex.1960); *Contra,* Thornburg v. Port of Portland, 233 Ore. 178, 376 P.2d 100 (1962).

As far as I have been able to discover, the Court of Appeals in this circuit has not passed upon this question. The two Second Circuit cases frequently mentioned, Allegheny Airlines, Inc. v. Village of Cedarhurst, 238 F.2d 812 (2d Cir. 1956), and American Airlines, Inc. v. Town of Hempstead, 398 F.2d 369 (2d Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969), dealt with the constitutionality of local ordinances and have little or no bearing upon the present problem. Although there is thus no decision directly binding on me as to how *Causby* and *Griggs* should be interpreted, I feel that only cogent reasons should induce me to depart from the great weight of federal authority in other circuits. I have not found a sufficiently compelling reason to do so.

Although as an abstract proposition it is plausible to say that fumes, soot and vibration which strike a plaintiff's house horizontally, carried by the wind from an airfield across the road, are just as annoying to him as fumes, soot and vibrations which descend upon him vertically from an airplane passing overhead, still the fact remains that not only did the actual holdings in *Causby* and *Griggs,* on the facts of those cases, pertain only to the latter situation, but the language used by the Court pertained to it as well. As the passages heretofore quoted show, the Court stressed that "the line of flight is over the land," that "the use of the airspace immediately above the land" caused a diminution in its value, and that "the use of the land presupposes the use of some of the airspace above it." This language indicates to me, as it did to the courts in the several cases cited, that the Supreme Court's decisions were based on the theory that there was a taking because there had been an invasion of and intrusion upon the air over plaintiff's land, which, although he did not own it, he was entitled to use to build his house, to construct his fence, to erect his chimney.

 Not only must flights be over the land, they must be "frequent" and "low." "Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." 328 U.S. at 266, 66 S.Ct. at 1068.

 It remains to apply these principles to the facts of this case. As to some of the plaintiffs, the task is not difficult. Clearly, there was no taking of the properties of Corona, Proto or Salvatore Criscuolo. Their complaints are directed essentially to the disturbance created by taxiing planes and planes idling on the runway and at the terminal. This sort of damage comes directly within several of the decisions previously cited. It is consequential damage which does not rise to the Fourteenth Amendment level.

 Although the facts are different as to Camarota and Canali, the conclusion as to them is the same. Camarota's properties on Morgan Terrace are not

in the direct flight path of the incoming and outgoing planes. As far as the evidence shows, it was on only a very few occasions that a plane went near or over his property. This is not often enough to satisfy the requirement of frequency. The noise and soot from the planes that passed by within earshot but not over his property did not constitute enough of a direct and immediate interference to constitute a taking within the *Causby* rule.

According to ، Canali's testimony, private planes occasionally fly over his house and commercial airlines have done so on "several occasions" in the past four or five years, only in bad weather. This is not frequent enough. On all the evidence, I conclude that the evidence as to Canali's property does not meet the *Causby* test.

█ This leaves seven individual plaintiffs, Fusco in the north, Munro, Jones, Michael Criscuolo and Guidone in the southwest, Audette in the south, and Amendola in the southeast, to use the somewhat arbitrary geographical labels that I have previously employed. The testimony of none of them, with the exception of the Audettes, is as complete and explicit as one could wish. All of them tended to talk about the location of the planes with respect to their house, rather than with respect to their property as a whole. Granted that the lots in this area are small, still, obviously, there is more real estate in every parcel than is covered by the house itself.

Moreover, the testimony of some of the plaintiffs tended to be imprecise.

Fusco, for example, was not clear as to whether the planes passed directly over his house or a few feet to one side. Munro said that the planes were "practically over" his house.[9]

Despite the inarticulateness of some of this testimony, the fact remains that the properties of Munro, Michael Criscuolo, Guidone and the property formerly owned by Jones, all lie within the approach zone to the south of runway 2–20, Fusco's is directly in line with the north end of that runway, and Amendola's is directly in line with the southeast end of runway 14–32.[10] The planes landing and taking off from these runways must have passed so very close to these properties, if not directly over them, as to make it seem like unrealistic nitpicking to deprive these plaintiffs of the benefit of the *Causby* rule. As a practical matter, these properties were directly affected by the flights. The other evidence in the case, in addition to the testimony of the plaintiffs themselves, is sufficient to establish that the height of the planes was less than 500 feet and that they passed over several times a day. I believe that it can fairly be said that this is frequent enough. See Aaron v. United States, 311 F.2d 798, 160 Ct.Cl. 295 (1963); Jensen v. United States, 305 F.2d 444, 158 Ct.Cl. 333 (1962).

█ Although the question is close, I conclude, on all the evidence, that there was a sufficiently direct and immediate interference with these plaintiffs' use and enjoyment of their land to constitute a taking.[11]

9. By way of contrast, Amendola testified explicitly that the planes came over "in a direct line" with his house.

10. It was stipulated that the location shown on a map introduced in evidence for Michael Criscuolo's property is incorrect and that in fact that property lies more directly in the approach zone than the map indicates. Similarly, it was stipulated that the location shown on the map for one of Camarota's properties █

is incorrect and that in fact it lies close to his other two properties, all three of which are outside the approach zone.

11. If Jones can prove that, because of the overflights, he received less for the property which he sold than he would otherwise have received, an easement may be granted in that property binding on the purchaser and Jones may be compensated for it. Davis v. United States, 295 F. 2d 931, 155 Ct.Cl. 418 (1961).

34

Under *Griggs,* the "taker" of the easement in these properties was the City of New Haven, the owner and operator of the airport. It makes no difference that the airport was part of the National Airport Plan or that it was designed in accordance with federal regulations. The same was true of the airport in *Griggs.* The easement which the City is deemed to have taken is a permanent easement for the operation of a similar number of turbo prop planes and jet planes of the size presently used, *i. e.,* DC–9s and Boeing 727s.

There is no basis for holding that defendant airlines, in operating their planes over plaintiffs' properties on the routes and at the altitudes prescribed by federal regulations, have also taken an easement in those properties. *Griggs,* which involved "a number of airlines," did not so hold. On the contrary, it indicated that the airlines are not liable. 369 U.S. at 89, 82 S.Ct. 531, 7 L.Ed.2d 585. No case comparable to this one has imposed liability on commercial airlines, as far as I can discover. I conclude that defendant airlines are not liable for a taking.

■ I come now to the most difficult aspect of this part of the case, the determination of a dollar amount for the value of the easement which has been taken. The difficulty arises from the inadequacy of plaintiffs' proof on this subject. Plaintiffs called a real estate expert who testified, in substance, to his opinion that the fair market value of each of the properties in question has been reduced in a specific amount by virtue of the flights over it. These amounts varied from a low of $6,000 in Guidone's case, to a high of $20,000 in Amendola's. On cross examination, however, it became apparent that these figures were not supported by any concrete data with respect to sales of comparable properties. They appeared to be purely arbitrary, to all intents and purposes picked out of the air. The evidence indicates, and I so find, that the area in

the vicinity of the airport is by no means blighted. There is no indication of anything like a mass exodus. The homes are well maintained, new residences are being constructed, and there is an active market for them. As mentioned earlier in this opinion, both sides agree that the market is rising and that the properties in question could be sold by plaintiffs now for more than they cost them.

It is reasonable to believe that these properties could be sold for still more if they were not subject to these overflights, but the evidence does not permit of a determination as to how much more the price would be. I am unwilling to accept the unsupported guess of plaintiffs' expert, and apart from that, there is nothing to go on. It seems unlikely, in view of the circumstances recited above, that the increment would be anywhere near as high as plaintiffs' expert testified.

There has actually been a failure of proof on this subject and I could dismiss plaintiffs' claims for compensation on that ground. To do so seems to me unjust. Accordingly, I will hold a further hearing, limited strictly to this question of amount of compensation, at which time both sides may offer further evidence on the subject, unless by September 7, 1971 the parties file a stipulation agreeing as to the amount of the compensation for each of the properties, without, of course, waiving their right to object to any other part of this decision.

*Trespass, Annoyance and "Emotional Damage"*

■ There is no authority in support of plaintiffs' claim that they are entitled to separate damages for their mental anguish caused by the noise of the planes, for the interference with their peace and quiet, and for the fear which the planes inspire. These matters have sometimes been mentioned in the cases in which takings have been found

to have occurred. See Highland Park v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269 (1958). Presumably they have been taken into account in fixing the compensation for the taking. There seems to be no case in which, in the absence of a taking, recovery has been allowed for any such injury. I conclude that none of the plaintiffs is entitled to recover this type of damage from any of the defendants.

■ As far as trespass is concerned, it is my view that there should be no separate recovery by any plaintiff of damages for trespass, either against the City or against the airlines. "Trespass" in this context means trespass to the realty, an invasion of plaintiff's property. Where there has been such an invasion in this case by a substantial number of overflights, I have found the property owner to be entitled to recover from the City compensation for that taking. The taking includes the trespass. To allow recovery from the City of additional damages for the trespass would permit a double recovery for the same wrong. Where there has been no taking because there has been no significant invasion of plaintiff's property, it would seem to follow, at least as far as the City is concerned, that there has been no trespass on that property.

With respect to the airlines, there is very little authority on the subject beyond a dictum in City of Newark, New Jersey v. Eastern Airlines, Inc., 159 F. Supp. 750, 760 (D.N.J. 1958) which, although it used the word "trespass," seems to me to be referring to a taking. Inasmuch as, in view of *Griggs,* the airlines are not liable for a taking of property over which they fly their planes on prescribed routes, they should not be liable for the trespass, *i. e.,* the invasion of the airspace over those properties which these flights entail. As to the other properties where there has been no taking because of the absence of any significant overflights, it is my view, and in the absence of controlling authority to the contrary, I so hold, that these incidental overflights do not rise to the level of a compensable trespass in the absence of proof of negligence on the part of the airlines. There has been no adequate proof of such negligence in this case.

The so-called "consequential damage" to some properties resulting from the disturbance caused by the taxiing and idling planes is not, as I have pointed out, a taking under the authorities. It should not be a trespass either. Plaintiffs have not proved that the airlines were negligent in this respect. As I understand Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914), "consequential damage" in effect means noncompensable damage, *i. e., damnum absque injuria.* See the discussion of this subject in Thornburg v. Port of Portland, 233 Ore. 178, 376 P.2d 100 (1962). See also Schubert v. United States, 246 F. Supp. 170 (S.D.Tex.1965).

■ As to nuisance, that word has been used in those few cases in which the operation of a private airport has been enjoined. See, for example, Anderson v. Souza, 38 Cal.2d 825, 243 P. 2d 497 (1952). Calling the airport a nuisance was the reason given for enjoining it. As already stated, these cases are not applicable to a modern public airport constructed as part of the National Airport Plan and used by the public in the exercise of its right to transportation through the navigable airspace of the United States. Such an airport, at least in the absence of any evidence that it is improperly operated, is not a nuisance, see Delta Air Corporation v. Kersey, 193 Ga. 862, 20 S.E. 2d 245 (1942). There is no substantial evidence of improper operation here. Plaintiffs, therefore, are not entitled either to enjoin the operation of the airport or to recover damages for the annoyance which that operation causes them. Plaintiffs' injury arising from the normal operation of this public facility is not compensable.

*The Claim of the Town of East Haven against the City of New Haven*

I find no merit in this claim. We may assume, for the sake of argument, that the City should have revealed the Town's opposition to the airport expansion in the City's application for federal funds, although this question is by no means free from doubt, in view of the fact that the City's application was prepared, on a printed form, before the regulation was amended to require this disclosure. In any case, the Town has not demonstrated that it has been in any way damaged by this omission, if omission there was. It is pure conjecture to argue that if the Town's opposition had been known, the application would not have been approved, hence the runway would not have been extended, hence the jets would never have begun to fly. There is no evidence to support this speculation.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Judgment may be entered in accordance with this opinion in favor of defendants Eastern Airlines, Inc. and Allegheny Airlines, Inc. dismissing the action as against them, and in favor of defendant City of New Haven dismissing, as against it, all claims except the claims for compensation for the easement taken by defendant City of New Haven in the properties of Michael Fusco, 25 Holmes Street, Leslie Munro, 110 Morgan Avenue and 114 Morgan Avenue, Michael Criscuolo, 72 Morgan Avenue, Alphonse Guidone, Jr., 6 Canna Drive, Louis Audette, 10 Silver Sands Road, Leon Amendola, 2 Meadow Place, and the property formerly owned by Earle W. Jones, South End Road, as to which, as heretofore indicated, a further hearing will be held solely on the subject of the amount of compensation, unless the parties stipulate to that amount, without prejudice to their respective positions in all other respects.

So ordered.