[Civ. No. 43090. Second Dist., Div. Three. Aug. 28, 1974.]

CITY OF LOS ANGELES, Cross-complainant and Appellant, v. JAPAN AIR LINES CO., LTD., et al., Cross-defendants and Respondents.

COUNSEL

Burt Pines, City Attorney, Milton N. Sherman, Principal Assistant City Attorney, and Ronald J. Einboden, Deputy City Attorney, for Cross-complainant and Appellant.

O'Melveny & Myers, Henry C. Thumann, Ralph W. Dau, Gibson, Dunn & Crutcher, Dean Stern, Kirtland & Packard and Robert E. Moore, Jr., for Cross-defendants and Respondents.

OPINION

**FORD, P. J.**—Cross-complainant City of Los Angeles has appealed from that portion of a judgment which is in favor of the cross-defendant airlines.

The controversy arose out of an action in inverse condemnation brought by the owners of three parcels of real property located in the vicinity of Los Angeles International Airport (hereinafter sometimes designated as LAX). Plaintiffs alleged that defendant City of Los Angeles (hereinafter designated as the City), as owner and operator of LAX, had, by authorizing the regular flight of Boeing 747 and other jet aircraft to and from LAX, taken an avigation easement "for noise, smoke and vibration" over plaintiffs' real property. The City filed a cross-complaint for declaratory relief seeking a declaration that the City was entitled to contractual or

equitable indemnification from 31 of its lessee airlines and that it was entitled to equitable indemnification from two jet airframe and two jet engine manufacturers.

After a court trial, findings of fact and conclusions of law were filed. The trial court rendered its judgment on the complaint in favor of plaintiffs, adjudging that the City, as of June 29, 1970, had taken "an easement for air navigation purposes over, near and around" each of the plaintiffs' parcels of real property. The trial court rendered its judgment on the cross-complaint in favor of the cross-defendants, adjudging that the cross-defendant airlines and the cross-defendant manufacturers had "no obligation to indemnify . . . the City . . . for any loss, damage, liability or expense which it . . . incurred or suffered as a result of or in connection with the action filed against it by plaintiffs herein."

The City and the cross-defendant airlines stipulated that the trial record as to the cross-complaint would consist of certain admitted facts contained in (1) the "Joint First Pretrial Statement Between Cross-Complainant and Cross-Defendants," signed September 28, 1971 (paragraphs 1-134), (2) the "Supplemental Joint First Pretrial Statement Between Cross-Complainant and Cross-Defendants" submitted by cross-defendant Japan Air Lines Co., Ltd., filed October 7, 1971 (paragraphs I-X), and (3) the "Supplemental Joint Pretrial Statement Between Cross-Complainant and Air Carrier Cross-Defendants," filed August 14, 1972 (paragraphs 135-177). Also included in the record were exhibits Nos. 1-17 attached to the "Supplemental Joint Pretrial Statement" filed August 14, 1972, as well as various exhibits introduced at the time of trial. The parties further stipulated "that the record of the case in chief in this proceeding, insofar as it does not contradict any of the admitted facts set forth . . . [in the various pretrial statements to which reference has been made hereinabove] shall be a part of the record as to the cross-complaint of the City of Los Angeles and the cross-defendant Airlines."

It was stipulated that the cross-defendant A. W. Liquidating Co. had no active operations after April 1, 1970. A. W. Liquidating Co. joined in the stipulation respecting the record "except as to events after April 21, 1970."

Based on the record as hereinabove set forth the trial court made extensive findings of fact which will now be summarized.

LAX is operated by the department of airports of the City under the direction and control of the board of airport commissioners. LAX presently has four parallel runways, two south of the terminal area and two north of the terminal area. Approaching LAX from the east, the runways

south of the terminal are designated 25L (left) and 25R (right); and the runways north of the terminal are designated 24L and 24R.

LAX has been developed pursuant to a master plan originated by the City and first published and approved by the Civil Aeronautics Administration in 1945. From time to time since 1945 this master plan has been revised by the City, approved by the Civil Aeronautics Administration (CAA) or Federal Aviation Administration (FAA) and, as so revised, made public. The master plan layout includes the present runways and approach and takeoff areas.

The location of LAX and the locations of each of its runways were determined by the decisions of the City. These determinations were subsequently approved by the FAA.

Under the National Airport Plan promulgated by the administrator of the FAA, the United States has made grants in excess of $20 million to the City for the development of LAX, including the development of the north runway complex. Each of these grants to the City has involved a grant agreement by which the City has assured the United States that it will not permit any air carrier "to exercise any exclusive right" to the use of the airport.

By January 1959 commercial jet aircraft had commenced scheduled service at LAX. During the year 1959 the City constructed runway 24L north of the terminal. Construction of the second north runway, 24R, was commenced in 1968.

In 1967, prior to the opening of runway 24R, the City urged the Civil Aeronautics Board (CAB) to establish extensive new air transportation service between LAX and seven distant cities. The City actively promoted the use of LAX by both new tenant airlines and, by way of additional flights, by existing tenant airlines. The City based the decision to construct and open runway 24R upon its projections of an increase in the demand for commercial jet aircraft operations.

Prior to opening the north runway complex the City, recognizing potential noise problems, acquired all property underlying the approach paths to runways 24L and 24R as far east as Airport Boulevard, approximately 700 feet from that parcel owned by the plaintiffs which was located nearest to the airport.

On or about June 12, 1967, the City authorized the FAA to assign runway 24L for jet aircraft, subject to certain limitations. As of June 15, 1968, the City authorized the FAA to assign runway 24R for jet aircraft, subject to certain limitations.

The cross-defendant airlines have at all times complied with the various rules, regulations, resolutions and noise abatement procedures adopted and promulgated by the City and the FAA and in effect at LAX.

On its entry into the greater Los Angeles area, a Los Angeles bound commercial jet aircraft is under the control of the FAA Air Route Traffic Control Center located at Palmdale, California. When the aircraft is approximately 20 to 45 miles from LAX, controllers at the Air Route Traffic Control Center instruct the pilot to alter his radio frequency so as to make radio contact with Los Angeles Approach Control, located in the tower at the airport. At that time, FAA Approach Control assigns a specific altitude and compass heading at which the aircraft is to fly. Federal regulations require that on entering and operating within the LAX traffic area, jets and other large aircraft must be operated at an altitude of at least 1,500 feet except when further descent is required for a safe landing.

In addition to exercising approach control, the FAA maintains and operates an Instrument Landing System (ILS) which electronically establishes a three degree glide slope to each of the runways at LAX. Each of the aircraft operated by cross-defendant airlines is equipped with an electronic device which continuously monitors the ILS glide slope. No aircraft may be landed at LAX without first receiving an Air Traffic Control clearance. On receiving FAA clearance to approach for landing, the aircraft is required to be at or above the ILS glide slope at the outer marker and to remain at or above the ILS glide slope until reaching the middle ILS marker. The outer marker is located approximately five and a half miles from the approach end of the runway while the middle marker is located approximately one-half mile from the approach end of the runway.

No aircraft may taxi at or take off from LAX without first receiving an appropriate clearance from FAA Air Traffic Control. On receiving clearance to take off, each jet or other large aircraft is required to conform with all FAA takeoff and departure procedures and to climb to an altitude of 1,500 feet above the airport surface as rapidly as practicable.

During every portion of a commercial jet flight operated by the cross-defendant airlines, the aircraft operates under the explicit instructions and control of an FAA facility. Such instructions and control include both the assignment of the runway to which or from which the aircraft is to operate and the establishment of the flight pattern, including the path of descent and ascent, which the aircraft is to follow in landing and taking off. At all times relevant hereto, the operations of the cross-defendant airlines to and from LAX were conducted in complete conformity with all applicable

federal statutes, rules, regulations and instructions governing the control of the flight of aircraft, the use of the navigable airspace, and the control and abatement of aircraft noise.

Each of the cross-defendant airlines conducts its operations at LAX pursuant to a written lease from the City. By those leases the City, among other things, (1) granted each airline the right to use the "airport and appurtenances" for the "flying, landings and take-offs" of its aircraft; (2) represented to each airline that it had the right to lease the airport "together with all the facilities, rights, licenses, services and privileges herein granted . . ."; and (3) guaranteed each airline that "lessee shall peaceably have and enjoy the leased premises and all the rights and privileges of said Airport [LAX], its appurtenances and facilities granted herein."

The respective leases between the City and the cross-defendant airlines contain certain provisions relating to indemnification. The clause contained in the leases of 12 of the cross-defendant airlines provides as follows: "Airlines shall . . . hold City . . . harmless from any and all costs, liability, damage or expense . . . arising out of airline's operations in or on the demised premises, as a proximate result of the acts or omissions of airline . . . or arising out of any condition occasioned by the acts or omission of airline in its demised premises, or arising out of the operations of airline upon or about the demised premises, excepting such liability as may be the result of the direct and proximate negligence, acts, or omissions of the City . . . ."

The indemnification clause contained in the leases of nine of the cross-defendant airlines provides as follows: "Lessee agrees to indemnify and hold Lessor harmless from and against all loss and damage to which Lessor may be subject by reason of any act or negligence of Lessee causing damage to persons or property, or both, in connection with Lessee's use and occupancy of and operation at said Airport; provided, however, that Lessee shall not be liable for any damage, injury or loss occasioned by the negligence of Lessor, its agents or employees; and provided, further, that Lessor shall give to Lessee reasonable notice of any claim made or suit instituted, and Lessee shall have the right to compromise and defend the same."

A substantially identical clause is contained in the leases of two additional airlines. The other eight airlines are parties to general indemnification clauses which do not recite any exception for either acts and omissions or negligence on the part of the City.

None of the indemnification clauses contains any language expressly or

affirmatively protecting the City against liability resulting in whole or in part from any conduct in which the City has affirmatively participated or knowingly acquiesced.

A further portion of the findings of fact is as follows: "In the fall of 1967 the City represented to the cross-defendant airlines that the 'introduction of new and larger aircraft by the airlines and the increase in the use of air transportation by the traveling public' had resulted in a need for the enlargement and further development of Los Angeles International Airport. The City further disclosed its intention to undertake such expansion 'for the continued promotion and accommodation of air commerce, air navigation, air transportation and aviation, including but not limited to, the construction of new passenger and cargo terminal facilities, airfield facilities and land acquisition at airports owned, operated or controlled by [City] . . . .' It was also stated that City might acquire 'airspace or air easements or rights of way, or similar interests in land,' and that the costs of such acquisitions were to be deemed 'expenditures of capital funds' which would be amortized by way of landing fees over a reasonable period of time rather than reimbursed wholly in the year of acquisition. The airlines were in favor of such expansion and consulted with the City as to specific, immediately contemplated projects. However, the City expressly reserved the right 'to accomplish such other developments and improvements of the airport system owned, operated, and controlled by [City] as [City] shall from time to time, and in the prudent management of the system deem desirable and shall authorize.' The City proposed to finance such expansion by its immediate issuance of $75,000,000 in Airport revenue bonds and by its future issuance of such additional revenue bonds as may be necessary 'to accomplish such other developments and improvements . . . as [City] shall, from time to time . . . deem desirable and shall authorize.' On the basis of these written representations, each of the airlines executed an amendment to its basic lease whereby it agreed to pay the City such additional landing fees as might from time to time be necessary to service up to $300,000,000 of any bonded indebtedness so incurred by the City."

At the time of the City's opening of the north runway complex to regular jet aircraft operations, the department of airport's then general manager, in a letter to the FAA, expressly acknowledged his understanding that it was the City's responsibility to acquire substantial property so as to alleviate the noise problem resulting from such operations.

At the time of the execution of the 1967 lease amendments and at the time of the City's opening of the north runway complex to jet operations, it was the understanding of both the City and the cross-defendant airlines

that the City would acquire such property rights as the City in its discretion deemed necessary to permit the authorized operation of jet aircraft to the airport without unlawful interference with the affected property owners' respective rights to the use and enjoyment of their various properties.

Another portion of the findings of fact is: "Cross-complainant the City of Los Angeles actively participated and knowingly acquiesced in the conduct which resulted in the injury to the plaintiffs' real property . . . in that the City (a) determined the location of the airport and each of its runways; (b) constructed the north runway complex; (c) entered into leases with the cross-defendant airlines for the use of the Airport; (d) opened the north runways to commercial jet aircraft traffic while knowing of the resulting noise impact; (e) engaged in the preparation of the noise abatement procedures in effect at the Airport; (f) approved the use at Los Angeles International Airport of the aircraft that are operated by the cross-defendant airlines; (g) promoted extensive new air transportation service at Los Angeles International Airport; and (h) determined the extent of real property that it would acquire through the process of eminent domain in the vicinity of and under the approach paths to the north runway complex."

While the City does not here dispute its liability in inverse condemnation to the plaintiff property owners (as to liability of that nature, see *Aaron* v. *City of Los Angeles*, 40 Cal.App.3d 471 [115 Cal.Rptr. 162]), it does contend that it is entitled to indemnity from its lessee airlines either under the indemnity provisions contained in the lease agreements between the City and the cross-defendant airlines or by virtue of the doctrine of equitable indemnity.

The City's liability to the plaintiff landowners in this case is based on a determination that the City as owner and operator of LAX "has taken and condemned" an air easement for airport purposes "over, near and around" the plaintiffs' properties "without payment of just compensation as provided by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, Section 14 of the California Constitution." The trial court awarded compensation to the plaintiffs and condemned to the use of the City and to the use of the public an easement for air navigation purposes over, near and around each of the plaintiffs' real properties. Thus the plaintiffs relied solely on the concept of inverse condemnation and asserted no claim of negligence, maintenance of a nuisance or other theory of liability as against the City. The cross-defendant airlines were not parties defendant with respect to the complaint. Consequently, the question presented is whether under the circumstances of this case the airlines are liable on any theory to indemnify the City with respect to the City's

liability for a taking of an air easement without payment of just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and of article I, section 14, of the California Constitution.

■ At the outset it appears to be clear that the airlines themselves would not be liable to plaintiffs in an inverse condemnation suit such as the one brought against the City herein. While there are no California cases dealing with claims of inverse condemnation of an air easement as against air carriers, we are guided to our conclusion by California statutory law, decisions of the United States Supreme Court and courts of sister states.

In *Griggs* v. *Allegheny County,* 369 U.S. 84 [7 L.Ed.2d 585, 82 S.Ct. 531], the United States Supreme Court held that the County of Allegheny, which owned and operated the greater Pittsburgh Airport, had taken an air easement over the petitioner's property for which the county was required to pay just compensation under the Fourteenth Amendment where noise from the taking off and landing of aircraft at the airport rendered the residential use of petitioner's property undesirable and unbearable. The Supreme Court stated (369 U.S. at pp. 89-90 [7 L.Ed.2d at p. 589]): "It is argued that though there was a 'taking,' someone other than respondent was the taker—the airlines or the C. A. A. acting as an authorized representative of the United States. We think, however, that respondent, which was the promoter, owner, and lessor [fn. omitted] of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the C. A. A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed. . . . [I]t is the local authority which decides to build an airport *vel non,* and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built. . . . [¶] . . . As stated by the Supreme Court of Washington in *Ackerman* v. *Port of Seattle,* 55 Wash.2d 401, 413, 348 P.2d 664, 671, '. . . an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip itself, is constructed . . . .' Without the 'approach areas,' an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough."

Subsequently, in *Town of East Haven* v. *Eastern Airlines, Inc.* (D.Conn. 1971) 331 F.Supp. 16, affd. (2d Cir. 1972) 470 F.2d 148, cert. den., 411 U.S. 965 [36 L.Ed.2d 685, 93 S.Ct. 2144], the plaintiff property owners

sued the City of New Haven as the owner and operator of the local public airport and various lessee air carriers, claiming injury from airport noise. The court discussed various theories of liability. As to the matter of liability for a taking of the plaintiffs' property without just compensation it was stated (331 F.Supp. at p. 34): "There is no basis for holding that defendant airlines, in operating their planes over plaintiffs' properties on the routes and at the altitudes prescribed by federal regulations, have also taken an easement in those properties. *Griggs,* which involved 'a number of airlines,' did not so hold. On the contrary, it indicated that the airlines are not liable. 369 U.S. at 89, 82 S.Ct. 531, 7 L.Ed.2d 585. No case comparable to this one has imposed liability on commercial airlines, so far as I can discover. I conclude that defendant airlines are not liable for a taking."

In *City of Boston* v. *Massachusetts Port Authority* (D.Mass. 1971) 320 F.Supp. 1317, affd. (1st Cir. 1971) 444 F.2d 167, the court stated at page 1320: "Nor has plaintiff stated a cause of action under the fourteenth amendment against the airlines. [¶] First, if anyone 'took' Boston's property (that is if anyone 'deprived' Boston of its property, as the word 'deprive' is used in the fourteenth amendment), the taking was not by the airlines. In Griggs v. County of Allegheny, 369 U.S. 84, 89, 82 S.Ct. 531, 534, in a situation analogous to the case at bar, Mr. Justice Douglas, responding to the argument that the airlines were the takers, held that 'the promoter, owner, and lessor of the airport, was . . . the one who took the easement in the constitutional sense.' [¶] Second, the airlines are not alleged to be involved in any state action proscribed by the fourteenth amendment. The complaint does not allege that the Authority had no right to deprive the City of Boston of its property by the imposition of an avigation servitude. What the city claims is that the Authority violated the fourteenth amendment by not compensating the city for the deprivation. If the fourteenth amendment does require the Authority to compensate plaintiff, the airlines are not involved in the Authority's failure to pay such compensation. Nor are the airlines under an independent duty to make compensation on the theory that the taking which gives rise to the claim of compensation was effected with the aid of the airlines. See Yearsley v. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554."

Under California statutory law only certain governmental agencies are authorized to acquire by condemnation airspace above the surface of property or an air easement in such airspace adjacent to or in the vicinity of an airport. It is true that Civil Code section 1001[1] which pertains to ac-

---

[1]Civil Code section 1001 in its entirety is as follows: "Any person may, without further legislative action, acquire private property for any use specified in Section

quisition of property by eminent domain provides that "[a]ny person may, without further legislative action, acquire private property for any use specified in Section 1238 of the Code of Civil Procedure" and that Code of Civil Procedure section 1238, subdivision 20, specifies airport use as a use for which property may be so acquired. However, Code of Civil Procedure section 1239.3 specifically provides as follows: "Airspace above the surface of property or an air easement in such airspace may be acquired under this title by *a county, city, port district, or airport district* if such taking is necessary to provide an area in which excessive noise, vibration, discomfort, inconvenience or interference with the use and enjoyment of real property located adjacent to or in the vicinity of an airport and any reduction in the market value of real property by reason thereof will occur through the operation of aircraft to and from the airport." (Italics added.) In *City of Oakland* v. *Nutter,* 13 Cal.App.3d 752, at page 766 [92 Cal. Rptr. 347], the court stated: "Section 1239.3 purports to enlarge the powers of condemnation beyond property physically used for an airport (§ 1238, subd. 20; and see *City of Fresno* v. *Hedstrom* (1951) 103 Cal. App.2d 453, 456 [229 P.2d 809]), and beyond airspace necessary to protect the approaches to an airport (which by definition implies airspace overlying property which is subject to overflights by planes landing or taking off) to airspace overlying any 'real property located adjacent to or in the vicinity of an airport.' [¶] Manifestly this section was adopted to permit appropriate governmental bodies to take the initiative in securing rights which might otherwise be the subject of actions for inverse condemnation under the principle that interference with the use and enjoyment of such property by excessive noise, vibration, discomfort, and inconvenience through the operation of aircraft to and from an airport may be compensable even where the property involved is not subject to direct overflights. (See Van Alstyne, *op. cit.*, fn. 7, 16 U.C.L.A. L.Rev. 491, 528-535, particularly p. 532, fn. 165 and p. 536, fn. 185; and cases collected fn. 11 above.)"

In *People* v. *Oken,* 159 Cal.App.2d 456, at pages 460-461 [324 P.2d 58], it was held that a private person seeking to exercise the right of eminent domain under Civil Code section 1001 must show not only that he proposes to devote the property to one of the public uses set forth in Code of Civil Procedure section 1238, but also that "he is authorized to

---

1238 of the Code of Civil Procedure either by consent of the owner or by proceedings had under the provisions of Title 7, Part 3, of the Code of Civil Procedure; and any person seeking to acquire property for any of the uses mentioned in such Title is 'an agent of the State,' or a 'person in charge of such use,' within the meaning of those terms as used in such Title. This section shall be in force from and after the fourth day of April, eighteen hundred and seventy-two."

devote the property to the public use in question, or otherwise stated, that he is a person authorized to administer or have 'charge of such use.' " Manifestly, the cross-defendant airlines are not authorized to administer or have charge of the use of airspace over and in the vicinity of the approach ways to LAX.[2]

We turn then to a consideration of the City's contention as to the cross-defendant airlines' duty to indemnify the City for its liability in inverse condemnation to the plaintiff property owners. ▇ Since in the leases the parties expressly contracted with respect to the airlines' duty to indemnify the City, the extent of that duty must be determined from the respective contractual provisions and not from the independent doctrine of equitable indemnity.[3] (*Price* v. *Shell Oil Co.,* 2 Cal.3d 245, 256 [85 Cal. Rptr. 178, 466 P.2d 722]; *Markley* v. *Beagle,* 66 Cal.2d 951, 961 [59 Cal.Rptr. 809, 429 P.2d 129].) Such an indemnity provision is to be construed under the same rules which govern other contracts with a view of determining the actual intent of the parties. (*Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.,* 3 Cal.3d 434, 442 [91 Cal. Rptr. 6, 476 P.2d 406].) ▇ While the agreed statements of fact contain factual matters in the nature of extrinsic evidence, the interpretation of the indemnity provisions does not turn on the credibility of extrinsic evidence. Consequently, the interpretation is solely a judicial function and is, therefore, a question of law. (See *Parsons* v. *Bristol Development Co.,* 62 Cal. 2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) ▇ We therefore proceed to make an independent determination of the meaning of the indemnity provisions with respect to the particular liability which forms the basis of the City's claim of a right of indemnification. (See *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G., supra,* 3 Cal.3d 434, 445-446.)

It is clear from the record that the cross-defendant airlines did no more

---

[2]In 9 Ops.Cal.Atty.Gen. 184 (April 18, 1947) at pages 191-192, the then Attorney General expressed the opinion that, under the statutory scheme referred to herein, private individuals and corporations had no right to condemn airspace easements over property located under and around approach ways to private airports.

[3]This is not a case such as *People* ex rel. *Dept. Pub. Wks.* v. *Daly City Scavenger Co.,* 19 Cal.App.3d 277, 280-281 [96 Cal.Rptr. 669], wherein the incident for which indemnification was sought occurred at a geographical area well removed from the area expressly covered by the indemnification agreement and was only remotely related to the subject matter of the agreement. In the instant case the damage producing conduct was an inevitable result of the airlines' exercise of the rights given to them under the lease agreements. The parties having expressly contracted for indemnification with respect to the airlines' operations under the lease agreements, the City cannot look to the doctrine of equitable indemnification to expand the airlines' obligation of indemnity.

than use LAX and the flight approaches thereto in the manner contemplated by and provided for in their lease agreements with the City. Any harm to adjoining landowners was an inevitable consequence of the exercise by the cross-defendant airlines of the very rights granted to them by the leases. As will be explained, there is no indication in the lease agreements taken as a whole that the parties intended the airlines to indemnify the City for such conduct.

We note that in 1967, based on the City's representations respecting further expansion of LAX and the necessity for acquisition of "airspace or air easements or rights of way, or similar interests in land," and the City's representation that the costs of such acquisitions were to be deemed capital expenditures which could be amortized by way of landing fees over a reasonable period of time, each of the cross-defendant airlines executed an amendment to its basic lease agreeing to pay the City such additional landing fees as might from time to time be necessary to service up to $300,000,000 of any bonded indebtedness incurred by the City for future developments and improvements. It is not probable that the parties would have entered into such a transaction if it had been their intention in executing the basic leases that the airlines were to indemnify the City for damage to the property of adjacent landowners caused by noise from aircraft landing at and departing from LAX. Furthermore, at the time of the opening of the north runway complex to jet aircraft, the general manager of the City's department of airports expressed the department's concern over the "serious noise problem" with respect to the "approach area" to the north runway complex in a letter addressed to the FAA, and stated that the "problem will exist until we have approval of the condemnation ordinance for the 980 homes located in the area." These incidents indicate that the City understood that it was responsible for acquiring such property rights as were necessary to permit authorized operation of jet aircraft to and from the airport without unlawful interference with the property rights of adjacent landowners.

■ Acts of the parties, subsequent to the execution of a contract and before any controversy has arisen as to its effect, may be taken into account in determining the meaning of the contract. Thus, in *Bohman* v. *Berg,* 54 Cal.2d 787, at page 795 [8 Cal.Rptr. 441, 356 P.2d 185], the Court described as a "cardinal rule of construction" the rule "that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties." (See *Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 753-754 [8 Cal.Rptr. 427, 356 P.2d 171]; *Automobile Salesmen's Union* v. *Eastbay Motor Car Dealers, Inc.,* 10 Cal.App.3d 419, 424 [89 Cal.Rptr. 20].)

While we find no California case dealing with the question, decisions elsewhere have considered whether a governmental entity is entitled to indemnity under a contractual indemnification clause for a taking without just compensation in connection with a public project. In *Massachusetts Turnpike Authority v. Perini Corp.,* 349 Mass. 448 [208 N.E.2d 807], the authority entered into a contract with Perini to construct an additional traffic tunnel under Boston harbor, to modernize the existing tunnel and to combine the two tunnels as a single project. The contract provided that Perini should indemnify the authority against liability "for or on account of any injuries to persons or damage to property arising out of or in *consequence* of the acts of [Perini] in the performance of the work covered by the contract and/or [*sic*] failure to comply with [its] terms." (Italics in original.) The authority acquired all property and rights deemed by it to be essential for the construction by formal eminent domain proceedings. However, property of landowners was physically injured or destroyed during the construction, and in some cases rights of access were impaired. As a result, 44 landowners initiated petitions against the authority. The authority contended that Perini was bound to indemnify it "for damages, other than for takings by eminent domain, caused to property in the course of the construction." The court held that Perini was not liable to indemnify the authority, stating (349 Mass. at p. 455 [208 N.E. 2d at p. 812]): "We construe Perini's liability to indemnify the authority as excluding not only all damages for direct takings by eminent domain, but also, so far as such damages may be obtained under G.L. c. 79, (a) all damages, attributable or related to a taking, for injury to the remainder of a parcel of land, a part of which has been taken; (b) all 'special and peculiar' damages (by reason of deprivation of access or otherwise) 'to a parcel of land injured when no part of it has been taken' (see G.L. c. 79, § 12, as amended through St. 1959, c. 626, § 4; see also Webster Thomas Co. v. Commonwealth, 336 Mass. 130, 138-139, 143 N.E.2d 216); and (c) damages from injuries which are 'inevitable' in carrying out a public project. All such injuries arise, not from any act of Perini (see the Bryne case, 297 Mass. 156, 160-161, 8 N.E.2d 170), but from the sovereign act of appropriation of property by eminent domain. Compensation is paid for them (either as a matter of constitutional necessity or by legislative command) because of the exercise of that right. If the parties had intended substantially to extend beyond usual forms of tort liability the natural scope of Perini's obligation to indemnify the authority, the parties would have been unlikely to leave that extension to implication." (See *Bryne* v. *City of Gloucester,* 297 Mass. 156, 158-159 [8 N.E.2d 170, 171-172].)[4]

---

[4]The rationale of these Massachusetts indemnity cases is in accord with that of California cases which hold that a private contractor who faithfully performs work

In view of the circumstances presented here we cannot expand the meaning of the indemnification clauses involved to include indemnity for liability resulting from a taking without just compensation of air easements over property adjacent to the airport.

The judgment for the cross-defendant airlines on the cross-complaint is affirmed.

Cobey, J., and Allport, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 8, 1974. Sullivan, J., did not participate therein.

---

on a public project in conformance with the plans and specifications furnished by a public agency cannot be held liable for a taking of private property damaged as a result of the contractor's work. Thus, in *Leppo* v. *City of Petaluma*, 20 Cal.App.3d 711, at page 719 [97 Cal.Rptr. 840], the court stated: "Judgment was also awarded against appellant Cecil H. Kinney, the contractor engaged by the city to do the demolition of respondents' building. The judgment as to Kinney must be reversed. [¶] 'The law is well settled that the contractors or subdividers could not be held liable for the damage in a direct or inverse condemnation suit. " 'If the contractor follows the plans and specifications furnished by the public agency, and damage results to the adjacent property, the public agency and not the contractor is liable.' " [Citations.] The reason for the rule is obvious. In case of damages in an inverse condemnation proceeding it is the public that has devoted the property to the public use, and the public and not the private contractor should pay for the damage. . . .' [Citations.]" (See *Heimann* v. *City of Los Angeles*, 30 Cal.2d 746, 756-757 [185 P.2d 597] [overruled on another point in *County of Los Angeles* v. *Faus*, 48 Cal.2d 672, 680 (312 P.2d 680)]; *Steiger* v. *City of San Diego*, 163 Cal.App.2d 110, 113 [329 P.2d 94].)