**In re WESTSIDE PRINT WORKS, INC., Debtor.**

**Miriam LACEY, David Lacey, and Linda Knight, Appellants,**

v.

**WESTSIDE PRINT WORKS, INC., Appellee.**

**BAP No. CC–94–1708–HMeO.**

**Bankruptcy No. LA 93–42327.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Feb. 22, 1995.

Decided March 21, 1995.

Rocky W. Dorcy, Encino, CA, for appellants.

Evan L. Smith, Los Angeles, CA, for appellee.

Before HAGAN, MEYERS and OLLASON, Bankruptcy Judges.

## OPINION

HAGAN, Bankruptcy Judge:

Appellants, Miriam Lacey, David Lacey and Linda Knight (collectively referred to herein as the "Lessors"), are the owners of certain non-residential real property located in Santa Monica, California (the "Property"). On or about November 1, 1989, the Lessors entered into an agreement (the "Lease") to lease the Property to Westside Print Works, Inc. ("Westside").

The Lease was prepared by the Lessors on a standard commercial lease form printed by the American Industrial Real Estate Association. The parties completed most, but not all of the blanks provided in the form. The parties also attached two addendums to the Lease. The first addendum, dated November 1, 1989, provided for automatic rent increases. The second addendum, dated December 1, 1989, gave Westside the option to extend the Lease an additional twelve months.

In 1993, Westside fell behind in its rent payments. Westside filed its petition for relief under Chapter 11 of Title 11 of the United States Code on September 9, 1993. On the date the petition was filed Westside was approximately $17,000.00 in arrears under the terms of the lease.

After obtaining two extensions of time to assume or reject the Lease pursuant to 11 U.S.C. § 365, Westside assumed the Lease on March 28, 1994, via confirmation of its Chapter 11 Plan of Reorganization.

On March 31, 1994, the Lessors delivered a letter to Westside's attorney claiming the amount necessary to cure the defaults under the Lease was $50,842.00. The demand letter itemized the amount claimed as follows: (1) past rent due for the months of June, July, and September of 1993, plus late charges and interest, $20,909.68; (2) increases required to bring the security deposit into conformity with the terms of the Lease, $1,245.00; (3) increases in insurance premiums, $245.00; (4) property tax increases, $18,971.30; and (5) attorney's fees, $9,472.00. Westside objected, claiming the only amount due under the Lease was back rent in the amount of $20,909.68.

After notice and a hearing the bankruptcy court entered an order on May 32, 1994 providing that the amount necessary to cure the Lease was $20,909.68. The Lessors appealed.

### Standard of Review

A bankruptcy court's findings of fact must be upheld by the reviewing court unless they are clearly erroneous. *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1377 (9th Cir. 1985); Fed.R.Bankr.P. 8013. A bankruptcy court's conclusions of law are subject to *de novo* review. *In re Pizza of Hawaii*, 761 F.2d at 1377.

The Lessors contend the bankruptcy court's decision was based entirely on his construction of the Lease and therefore is subject to *de novo* review. Westside contends the determination of the amount necessary to cure the default was a factual question subject to reversal only if clearly erroneous. As discussed *infra*, the bankruptcy court's decision necessarily involved both factual conclusions regarding the parties subsequent conduct, and legal conclusions regarding the meaning of the Lease provisions and the effect of the parties subsequent conduct.

### Discussion

Bankruptcy code sections 365(b)(1)(A) and (B) provide:

(b)(1) If there has been a default in an executory contract or unexpired lease of

the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default; [and]

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; ....

11 U.S.C. §§ 365(b)(1)(A) and (B).

■ Applicable state law governs the determination of how much is necessary under a lease to cure the default. *255 Turnpike Associates v. J.W. Mays, Inc. (In re J.W. Mays, Inc.)*, 30 B.R. 769, 772 (Bankr. S.D.N.Y.1983); *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr.S.D.Tex.1992).

## A. Property Taxes

Paragraph 10.1 [1] of the Lease provides the Lessors will pay the property taxes assessed on the Property. However, paragraph 10.1 also provides that if the taxes assessed increase over the amount assessed in a particular fiscal year, Westside will pay the amount of the increase. The parties did not complete the blank in the Lease for defining the base fiscal year. Consequently, the Lease is ambiguous as to whether paragraph 10.1 should be applied; and if so, as to what year the parties intended to be the base year.

The Lessors contend the bankruptcy court should have construed the base year to mean 1989—the year the parties entered into the Lease. In addition, the Lessors contend the parties did not intend the property tax increase provision to apply to ordinary increases, but only to extraordinary increases. The Lessors state that the reason they did not assess any of the property taxes pre-petition is that the pre-petition property tax increases were nominal cost-of-living increases. However, Lessor David Lacey's father died sometime during the last couple of years and as a result the property taxes for all of the relevant years were reassessed under California Proposition 13 in 1994.[2] The reassessment resulted in an significant increase.

However, the Lessors have not submitted any evidence with regard to the parties' intent other than the Lease itself. Further, the Lessors claim not only the tax increase allegedly caused by Mr. Lacey's death, but also the ordinary tax increases.

Westside contends the Lessors' pre-petition failure to assess the tax increases establishes that the reason the parties left the space for the base year blank was because the parties did not intend the tax increase provision to apply.

■ Under California law, ambiguities in a lease or other contract are generally construed against the drafter. *Federal Leasing Consultants, Inc. v. Mitchell Lipsett Company, Inc.*, 85 Cal.App.3d.Supp. 44, 48–49, 150 Cal.Rptr. 82, 84 (Cal.Super.1978); *Ponder v. Blue Cross of Southern California*, 145 Cal.App.3d 709, 718, 193 Cal.Rptr. 632, 636 (Cal.App.1983). The Lessors prepared the Lease using a standard form prepared by an association of commercial lessors. Therefore, ambiguities in the Lease should be interpreted against the Lessors. Accordingly, the ambiguity in the lease caused by the blank should be interpreted to mean the

---

**1.** Paragraph 10.1 of the Lease provides:

"**Payment of Tax Increase.** Lessor shall pay the real property tax, as defined in paragraph 10.3 applicable to the Premises, provided, however, that Lessee shall pay, in addition to rent, the amount, if any, by which real property taxes applicable to the Premises increase over the fiscal real estate tax year 19  19  . Such payment shall be made by the Lessee within thirty (30) days after receipt of Lessor's written statement setting forth the amount of such increases and the computation thereof. If the term of this Lease shall not expire concurrently with the expiration of the tax fiscal year, Lessee's liability for increased taxes for the partial lease year shall be prorated on an annual basis."

**2.** The tax assessments faxed to Westside's attorney on April 5, 1995, show that there was a retroactive adjustment of the taxes assessed to the Property in 1994. Mr. Smith's letter to the Westside, dated April 18, 1994 implies but does not state that taxes for the previous years were readjusted in 1994. (The letter also states that the portion of the increase actually attributable to the Property is $8,081.77, not the $18,971.74 claimed by the Lessors).

parties did not intend to include the property tax increase provision.

Further,

[a]cts of the parties, subsequent to the execution of a contract and before any controversy has arisen as to its effect, may be taken into account in determining the meaning of the contract. Thus, in *Bohman v. Berg* [1960], 54 Cal.2d 787, at page 795, 8 Cal.Rptr. 441, at page 446, 356 P.2d 185, at page 190, the Court describes as a 'cardinal rule of construction' the rule 'that when a contract is ambiguous or uncertain the practical construction placed on it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties. [citations omitted].

*City of Los Angeles v. Japan Air Lines Co., Ltd.*, 41 Cal.App.3d 416, 429, 116 Cal.Rptr. 69, 79 (Cal.App.1974); *see also Lix v. Edwards*, 82 Cal.App.3d 573, 579, 147 Cal.Rptr. 294, 298 (Cal.App.1978) ("[G]reat weight is given to the contemporaneous construction of the contract by the parties themselves prior to the time controversy over its meaning arose."); *Automobile Salesmen's Union, Local 1095 v. Eastbay Motor Car Dealers, Inc.*, 10 Cal.App.3d 419, 424, 89 Cal.Rptr. 20, 22 (Cal.App.1970).

The parties' previous failure to implement the property tax provision evidences the parties' intent not to enforce the property tax increase provision. The bankruptcy judge did not err in concluding that the parties did not intend paragraph 10.2's property tax increase provision to apply.

## B. Increased Insurance Premiums and Security Deposit

Paragraphs 8.2 and 8.3 of the Lease provide that the Lessors will obtain and pay for liability insurance insuring the Lessors, and property insurance covering the Property. Paragraph 8.4(a)[3] of the Lease provides that if the insurance premiums rise over the "Base Period" Westside will pay the amount of the increase.

Paragraph 5[4] of the Lease provides that if the rent increases, Westside will increase the amount of the security deposit in proportion to the rent increase.

Neither paragraph is on its face ambiguous. However, Westside contends the parties' subsequent conduct proves the parties did not intend either provision to apply.

The insurance premium increased several times during the pre-petition term of the Lease but the Lessors never assessed Westside for the increased premiums. Similarly, pursuant to the addendum to the Lease dated November 1, 1995, rent automatically increased on June 1, 1991, December 1, 1991 and June 1, 1994; but the Lessors never demanded any additional security deposit in accordance with paragraph 5. Westside contends the Lessors' failure to enforce these provisions demonstrates the parties did not intend these provisions be part of the Lease.

---

**3.** Paragraph 8.4(a) provides:

"(a) Lessee shall pay to Lessor, during the term hereof, in addition to rent, the amount of any increase in premiums for the insurance required under Paragraphs 8.2 and 8.3 over and above such premiums paid during the Base Period, as hereinafter defined whether such premium increase shall be the result of the nature of Lessee's occupancy, any act or omission of Lessee, requirements of the holder of a mortgage or deed of trust covering the Premises, increased valuation of the Premises, or general rate increases. In the event that the Premises have been occupied previously, the "Base Period" shall mean the last twelve months of the prior occupancy. In the event that the Premises have never been previously been occupied, the premiums during the "Base Period" shall be deemed to be the lowest premiums reasonably obtainable for insurance assuming the most nominal use of the Premises. Provided, however, in lieu of the Base Period, the parties may insert a dollar amount at the end of this sentence which figure shall be the Base Period $_____. In no event however, shall Lessee be responsible for any portion of premium cost attributable to liability coverage in excess of $1,000,000 procured under paragraph 8.2."

**4.** Paragraph 5 of the Lease provides:

"**Security Deposit**.... If the monthly rent shall, from time to time, increase during the term of this Lease, Lessee shall thereupon deposit with Lessor additional security deposit so that the amount of security deposit held by the Lessor shall at all times bear the same property to current rent as the original security deposit bears to the original monthly rent set for in Paragraph 4 hereof...."

Westside relies on, *Automobile Salesmen's Union, Local,* 10 Cal.App.3d at 424, 89 Cal. Rptr. at 22, for the proposition that "[a]mbiguity [in an otherwise unambiguous lease] can be created where the parties have demonstrated by their actions and performance what the contract meant to them, even though the words, standing alone, might have a different meaning to the court."

In *Automobile Salesmen's Union,* the salesmen's union entered into collective bargaining agreement with the dealerships owned or affiliated with Eastbay Motor Car Dealers, Inc. The agreement provided additional dealerships could be added to the agreement upon confirmation by the dealership and Eastbay that the dealership had authorized Eastbay to be its agent and that the dealership would be bound by the agreement. In addition, the collective bargaining agreement provided that if the union negotiated a more favorable agreement with another employer, Eastbay would have the option of adopting the more favorable contract in lieu of the agreement. Although the actual text of the agreement only permitted Eastbay to adopt a more favorable agreement, the union accepted an election to adopt a more favorable agreement from an individual dealership represented by Eastbay. However, after a number of other dealerships made a similar election, the union reversed its position and claimed the agreement did not allow .individual dealerships to adopt a more favorable agreement. The court found that the Union's acceptance of the first dealership's election, was a better indicator of the parties' intent then the plain meaning of the collective bargaining agreement.

The present case differs from *Automobile Salesmen's Union,* because in that case the parties' conduct was affirmative, not, as here, mere failure to enforce a provision. Nor did the interpretation implied by the parties' conduct suggest that an entire provision of the contract had no meaning whatsoever. Nevertheless, where the parties have entered into contract using a lengthy form document, it is not unreasonable to conclude that if the

parties consistently ignore a provision of the contract, the parties did not intend that particular portion of the form contract to apply. Accordingly, the bankruptcy court did not err in concluding the parties did not intend the increased insurance premium and increased security deposit provisions of the Lease to apply.

■ Further, even if the parties originally intended the insurance premium and security deposit provisions to apply, the Lessors have clearly waived these provisions. However, Lessors contend the waiver provision of the Lease prevent this result. Paragraph 24 of the Lease states:

> No waiver by Lessor of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the Lessee of the same or any other provision.....

In *Salton Community Services District v. Southard,* 256 Cal.App.2d 526, 64 Cal.Rptr. 246 (1967) the lease similarly provided that waiver of the breach of a term would not be deemed waiver of the term. The lessee breached a no-camping covenant contained in the lease and the lessor did not enforce the covenant. *Id.* 256 Cal.App.2d at 529, 64 Cal. Rptr. at 249. The court held that the non-waiver provision in the lease did not prevent the lessee from waiving a particular violation of the covenant. *Id.* 256 Cal.App.2d at 531, 64 Cal.Rptr. at 250.

Here, the Lessors have waived payment of the increase on each of the insurance premiums separately. Similarly, they waived the increased security deposit requirement on three separate and distinct occasions. The anti-waiver provision in the Lease does not prohibit such waivers.

### C. Contractual Attorney's Fees

■ There are two provisions in the Lease which provide for the award of attorneys' fees: paragraph 31 and paragraph 13.2. Lessors contend paragraph 31 does not apply and seek attorney's fees solely under paragraph 13.2.[5]

---

**5.** Paragraph 13.2 of the Lease provides in relevant part:

"**Remedies.** In the event of any such material default or breach by the Lessee, Lessor may at any time thereafter, with or without notice or

Pursuant to paragraph 13.2 of the Lease, the Lessors were entitled to one set of remedies under subparagraph 13.2(a) of the Lease if they elected to evict Westside, and another set of remedies under paragraph 13.2(b) of the Lease if they allowed Westside to remain in possession of the Property. Westside defaulted pre-petition and the Lessors did not elect to evict Westside. Therefore, the Lessors are entitled to the remedies set forth in section 13.2(b) not 13.2(a). Paragraph,13.2(a) provides for the award of attorney's fees incurred in recovering the Property. Paragraph 13.2(b) does not. Accordingly, the Lessors are not entitled to any award of attorney's fees under paragraph 13.2 of the Lease.

### D. Attorney's Fees Under Section 365(b)(1)(B)

■ Bankruptcy code section 365(b)(1)(B) provides that in the event a debtor-in-possession assumes a lease, the debtor-in-possession must compensate the lessor, "for any actual pecuniary loss to such party resulting from such default." 11 U.S.C. § 365(b)(1)(B). The Lessors contend that section 365(b)(1)(B) provides an independent right to compensation for loss including attorney's fees. In this circuit there are only two decisions considering whether section 365(b)(1)(B) provides an independent right to attorney's fees: *In re Westworld Community Healthcare, Inc.*, 95 B.R. 730, 733–34 (Bankr. C.D.Cal.1989); and *In re F & N Acquisition Corp.*, 152 B.R. 304, 308 (Bankr.W.D.Wash. 1993).

In *Westworld,* the bankruptcy court concluded:

demand and without limiting Lessor in the exercise of any right or remedy which the Lessor may have by reason of such default or breach.
(a) *Terminate Lessee's right to possession of the Premises by* ˙*any lawful means, in which case* this Lease shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor. In such event (i.e. default) Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including but not limited to, the cost of recovering the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorney's fees, and any real estate commission actually paid....

Although I was unable to find a case in which attorneys' fees were awarded without an attorneys' fee clause, the imposition of such a contingency is inconsistent with the statutory language in § 365(b)(1)(B). Section 365(b)(1)(B) broadly compensates for "... any actual pecuniary loss ... resulting from such default." 11 U.S.C. § 365 (West Supp.1988). It was designed to limit a trustee's power to assume. With this in mind, a narrow interpretation of compensation would be inconsistent with the purpose of this provision.

*In re Westworld Community Healthcare, Inc.,* 95 B.R. at 733. The *Westworld* court then cited *Andrew v. KMR Corp. (In re Bullock),* 17 B.R. 438 (9th Cir. BAP 1982) for the proposition that the fact the lease contained a separate attorney's fees clause did not limit the application of subsection (B).[6] However, *In re Bullock* is not determinative of the issue. In *Bullock,* the bankruptcy court found the lessor had a right to his attorney's fees under both the lease (pursuant to subsection (A)) and an independent right to the fees under subsection (B). The panel affirmed based on the attorney's fees clause in the lease without construing subsection (B). Thus, the *In re Bullock* panel did not determine whether an independent right to attorney's fees is available under subsection (B).

Also relying on *In re Bullock,* the bankruptcy court in *F & N Acquisition* reached the opposite conclusion. In *F & N Acquisition* the lease specially required that each party bear its own attorney's fees incurred in enforcing the lease. Under these circumstances, the *F & N* court concluded no inde-

(b) *Maintain Lessee's right to possession in which case* the Lease shall continue in effect whether or not Lessee shall have abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover rent as it becomes due hereunder...." (emphasis added).

**6.** *See also In re French,* 131 B.R. 138, 141 (Bankr.E.D.Mo.1991) (following *In re Westworld* ); *In re BAB Enterprises,* 100 B.R. 982, 984 (Bankr.W.D.Tenn.1989) (following *Westworld* and awarding attorney fees pursuant to subsection (B)).

pendent right to attorney's fees is available under subsection (B). *In re F & N Acquisition,* 152 B.R. at 308.

Outside this circuit, the majority of courts have rejected the *Westworld Community* decision and held that, "section 365 does not, and was not intended to, give creditors greater rights than they would have had under the contract or lease which gave rise to the debt." *In re Ryan's Subs, Inc.,* 165 B.R. 465, 468 (Bankr.W.D.Mo.1994).[7] These cases rely on the "American Rule," that unless otherwise specified in a contract or statute, parties to litigation must bear their own attorney's fees. *See Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 741 (9th Cir.1985) *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) (applying American rule to § 362); *Layman v. Combs,* 994 F.2d 1344, 1352–53 (9th Cir.1992) *cert. denied, sub nom. Bryant v. Klein,* — U.S. —, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993) (following the American rule in Securities Act case.) We also conclude that the American rule prohibits award of attorney's fees pursuant to subsection (B).

Further, Congress specifically grants the right to attorney's fees in other provisions of the Code. *See* 11 U.S.C. § 363(h) (allowing recovery of "actual damages, including costs and attorney's fees"); and 11 U.S.C. § 506(b) (allowing fees provided for under a security agreement). Because Congress has specifically provided for fees in some circumstances but not in others, the courts should not imply attorney's fees where they are not specifically provided for by contract or statute.

Accordingly, we reject *In re Westworld,* and hold that subsection 365(b)(1)(B) does not provide an independent right to attorney's fees.

The decision of the bankruptcy court is AFFIRMED.

---

**7.** *See also In re Child World, Inc.,* 161 B.R. 349, 353–54 (Bankr.S.D.N.Y.1993); *In re Hillsborough Holdings Corp.,* 126 B.R. 895, 898 (Bankr. M.D.Fla.1991) (rejecting *In re Westworld; In re Joshua Slocum, Ltd.,* 103 B.R. 601, 607–08) (Bankr.E.D.Pa.1989) (rejecting *In re Westworld Community Healthcare, Inc.* and holding subsection (B) does not create an independent right to attorney's fees).